AUG-01-2003 FRI 01:35 PM PHILLIPS & ANGLEY   Case 4:15-cv-40146-TSH   Document 74-2   FAX NO. 6172270992   Filed 11/23/16   Page 1 of 38.   01

AUG 01 2003 13:35 FR PIERCE ATWOOD        912077911350 TO 1152#8100#7511#1 P.02/39



**PIERCE ATWOOD**
*ATTORNEYS AT LAW*

**Byrne J. Decker**

One Monument Square
Portland, ME 04101

207-791-1152 voice
207-791-1350 fax
bdecker@pierceatwood.com

pierceatwood.com

August 1, 2003

**VIA FACSIMILE - (617) 227-8992**

Jonathan M. Feigenbaum, Esq.
Phillips & Angley
One Bowdoin Square
Boston, MA 02114

*Re:    Kathleen Therrien v. Unum Life Ins. Co. of America, et al.*

Dear Jonathan:

Attached is the document which Judge Tauro ordered Unum to produce in this case. As I have told you, this document was never adopted by Unum as a guideline, tool, manual or for any purpose whatsoever. Nor was it consulted or utilized in any respect with respect to this case. Indeed, it was not even drafted until July 29, 2002.

Sincerely,

Byrne J. Decker

BJD/llb
Enclosure

AUG 01 2003 13:36 FR PIERCE ATWOOD        912077911350 TO 1152#8108#7511#1 P.03/39



# FIBROMYALGIA
# POSITION STATEMENTS AND GUIDELINES

| I | Introduction to our Proposed Guidelines on Fibromyalgia | page 3 |
| II | Our Current Position Statements on Fibromyalgia | page 4 |
| III | A 2002 Understanding of Fibromyalgia | page 5 |
| IV | Some Notable Quotes on Fibromyalgia | page 14 |
| V | References/Bibliography | page 17 |
| VI | A Fibromyalgia Process Proposal | page 20 |
| VII | Tools which may be helpful in addressing functional capabilities and claimed limitations in reported cases of Fibromyalgia | page 23 |
| VIII | Contributors | page 30 |
|  | Appendix - Templates | page 31 |

# FIBROMYALGIA
# POSITION STATEMENTS AND GUIDELINES
### (7-29-2002)

## I.    INTRODUCTION

- The following is intended only to be a guideline. Each claim is unique and needs to be addressed on it's own individual merits.

- Please note that although these guidelines have been written for fibromyalgia, considerable overlap exists between fibromyalgia and other defined syndromes of medically unexplained symptoms (such as chronic fatigue syndrome).

- Unum Provident's Customer Care Philosophy:

    – To provide a thorough, fair, and objective evaluation of all claims
    – To pay all valid claims with high degree of customer service
    – To assist our claimants in their return to work efforts
    – To defend the company against invalid claims

- The intent of these guidelines are:

    – To provide a basic outline on what is currently known in respect to the defined syndrome of fibromyalgia.
    – To provide a list of references to support the opinions and statements expressed in the above outline.
    – To provide a Fibromyalgia Process Proposal in an effort to better leverage the return to work features in some of our contracts; and to better utilize the expertise of our physicians, psychologist, nurses, and rehabilitation professionals.
    – To provide an outline of some of the tools which may be helpful in addressing functional capabilities and claimed limitations, and give an understanding of how they might be utilized in some reported cases of fibromyalgia.

- Our ambition in our Fibromyalgia Process Proposal is to improve and enhance our effectiveness as enablers of wellness rather than of illness. It is certainly understandable to have compassion for a patient's reported suffering, but harm is done when that compassion allows one to become less functional.

- Our position statements and guidelines on fibromyalgia have been reviewed by three nationally recognized medical experts in rheumatology. It is expected that these guidelines will be updated and revised as advances in medicine require.

AUG-01-2003 FRI 01:36 PM PHILLIPS & ANGLEY          FAX NO. 6172278992          P. 03
        AUG 01 2003 13:36 FR PIERCE ATWOOD        912077911350 TO 1152#8100#7511#1 P.06/39

## II.   OUR CURRENT POSITION STATEMENTS ON FIBROMYALGIA

- Fibromyalgia is a defined syndrome; one that represents a patient population experiencing a constellation of medically unexplained symptoms.

- Current evidence does not allow one to conclude that fibromyalgia is a physical disease- its etiology remains unknown and to date no pathophysiological process has been established.

- Psychological factors may exist in a significant portion of individuals labeled with fibromyalgia.

- Treatment plans, which include cognitive behavioral therapy and a graded low impact aerobic, conditioning program, have been shown to improve symptoms in some fibromyalgia patients.

- The vast majority of individuals labeled with fibromyalgia have no physical impairment; they are on a physical basis able to return to work (especially with appropriate care). Generally, continued activity (including work) is of value even in the face of symptoms.

# III.   A CURRENT UNDERSTANDING OF FIBROMYALGIA

## Introduction – History

1. Unexplained chronic widespread body pain has been a source of confusion and bewilderment since the advent of medicine. Over the years, this problem has been given various names. The two best known and remembered are neurasthenia in the nineteenth century and fibrositis in the twentieth century. Today we call it fibromyalgia.

Beginning with the mid nineteen eighties, there has been a concerted effort to find new answers to this age-old problem. The formulation of the 1990 American College of Rheumatology (ACR) Classification Criteria gave further impetus to this effort, yielding numerous valuable clinical research studies, which have greatly advanced our understanding of this major problem.

Before presenting a summary of the more important new data from these studies, it is necessary to present and explain an unforeseen negative result coming from a misunderstanding of the purpose of the 1990 ACR Classification Criteria for Fibromyalgia.

The classification criteria were established and intended primarily for the clinical and epidemiologic research of patients with the symptom of widespread musculoskeletal pain. The purpose of the criteria was to provide research experts a uniform patient selection guide for the study of patients with widespread body pain.

Unfortunately, the use of the classification criteria i.e., the proper uniform selection of study patients, was misunderstood by some physicians in the day-to-day clinical practice, as a criterion for the diagnosis of individual patients presenting in their office with chronic widespread pain. Meeting the classification criteria is not equivalent to making a diagnosis in an individual patient.[1]

This initial misinterpretation soon expanded and escalated for many, both in clinical practice and medicolegal contexts, to the greater misunderstanding prevalent today. Many now view persons who satisfy the classification criterion as having a rheumatic disease, some even view them as having a chronic incurable disabling disease. Not all diagnoses are diseases.[2]

---

1

2

Two mindsets have developed. One acknowledges, as per their original intent, the classification criteria as a valuable tool for the selection of patients for research, the other inappropriately views persons satisfying the criteria as having a disease, that is, for some, a chronic progressive incurable disabling disease.

For our community of claims reviewers to provide a thorough, fair, and objective evaluation of fibromyalgia claims, it is mandatory for us to understand the genesis and evolution of the misinterpretation of the classification criteria.

Since the publication of the 1990 fibromyalgia classification criteria, it is claimed that more research papers have been written on this problem than any other medical condition. Although most of the research data directly address the problems of this unexplained widespread pain syndrome, its cause or causes, pathophysiology, pathology and treatment, many papers deal with the misunderstandings surrounding the classification criteria, the label fibromyalgia, the definition of syndrome, the value of tender points, and the question of physical disability.

## Summary of the current state of the art regarding fibromyalgia

- *Current thoughts concerning the 1990 ACR Classification Criteria for Fibromyalgia:*
    1. Classification criteria are necessary for the proper conduct of clinical trials and epidemiologic studies. They are useful for teaching purposes. They are, however, explicitly proscribed for diagnosis.[3] Satisfying the criteria does not necessarily mean that an idividual has fibromyalgia.
    2. The use of classification criteria for labeling certain conditions that do not meet the definition of disease (fibromyalgia) has been severely criticized. Such diagnostic labels, in themselves, may induce illness behavior.[4]
    3. The process of illness description needs to be dynamic with addition or changes to classification criteria as more is learned about these illnesses. Classification criteria are not illness, only descriptors that change as new knowledge is acquired.[5]
- *Current thoughts concerning "syndrome"*
    1. There are two kinds of syndromes. The first kind represents a grouping of symptoms resting on pathology and an underlying disease.
    2. The second kind of syndrome represents a grouping of unexplained symptoms with no known pathology and underlying disease.

---

[3]
[4]
[5]

3.  Fibromyalgia is a grouping of unexplained symptoms without demonstrable pathology or underlying disease; such groupings of unexplained symptoms are now termed by some authors "functional somatic syndromes".[6]

4.  Functional somatic syndromes are not restricted to and limited to the medical specialties which gave them birth, rather, they overlap. A patient often presents with several such syndromes, or parts of syndromes.[7]

5.  Such syndromes often present with concomitant underlying psychological distress.

6.  The fibromyalgia syndrome, when viewed as one of the many functional somatic syndromes, is seen as presenting with more than widespread body pain and tender points accompanied by fatigue, disordered sleep, poor memory and decreased concentration. It is now appreciated that the syndrome may present with any combination of symptoms from the following three symptom categories.

   (i)  Other unexplained somatic symptoms:
       1.  Tenderness, fatigue, sleep disorder, memory impairment, cognitive loss, short attention span, paresthesias, dizziness, anxiety, depression, dry mouth, feeling of swelling in the hands and feet
   (ii)  Other symptoms from overlapping functional somatic syndromes
       1.  Irritable bowel syndrome, irritable bladder syndrome, tension headaches, migraine headaches, TMJ syndrome, myofascial pain syndrome, allergies, sick building syndrome, dysmenorrhea
   (iii)  Psychological symptoms
       Anxiety, depression, personality disorders, illness behavior, somatization.[8]

- **Current thoughts concerning the diagnostic label "fibromyalgia"**
   1.  The label does not explain or define fibromyalgia. It is merely another name for chronic widespread musculoskeletal pain associated with other functional symptoms.
   2.  Fibromyalgia is not the name of a disease.

   3.  Some fibromyalgia experts argue that the labeling of fibromyalgia may be harmful. [9]

---

6
7
8
9

AUG-01-2003 FRI 01:51 PM PHILLIPS & ANGLEY    FAX NO. 6172276898    P. 04
Case 4:15-cv-40146-TSH    Document 74-2    Filed 11/23/2006    Page 9 of 38

AUG 01 2003 13:37 FR PIERCE ATWOOD        912077911350 TO 1152#8108#7511#1 P.10/39

- **Current findings and reflections concerning "tender points"**

    1. Recent studies show that there are no convincing reproducible structural or biophysiological abnormalities demonstrable at the sight of tender points.

    2. Studies reveal that tender points are a common finding. Although found in small numbers, they are present in healthy individuals. They are a common finding in many functional somatic syndromes, and found in large numbers in patients with psychological distress.

    3. Documented studies report a high correlation between high tender point scores and the level of distress, anxiety, depression, somatization and illness behavior.[10]

    4. Many physicians in clinical practice are thought to examine patients with tender points inaccurately, applying pressure in the wrong areas, applying too much pressure or too little pressure.[11]

    5. The reliability of tender points in the medicolegal setting of disability is unclear.[12]

    6. Recent data show that the emphasis on tender points does not adequately define the pain that people with fibromyalgia feel.

    7. People with fibromyalgia are more sensitive to musculoskeletal pain throughout their entire body, perhaps reflective of a lower pain threshold.[13]

- **Current findings on "subjective symptoms"**

    1. Recent data indicate that most but not all fibromyalgia research experts believe that fibromyalgia patients present solely with subjective symptoms.

    2. There are no generally accepted objective fibromyalgia illness markers.[14]

- **Current findings on "treatment"**

    1. "Although there is little evidence that most therapies usually employed in FM have any substantial long-term benefit, myriad treatment programs have sprung up. There is little scientific rationale

---

10
11
12
13
14

and research support for most of these interventions, and it seems clear that many FM treatments initiatives promote medicalization and prolonged illness"[15]

2. Narcotics are generally not recommended to treat pain in fibromyalgia patients.

3. It is necessary for patients with chronic pain to understand their condition. This requires willingness on the part of treating physicians to be generous with their time spent with the patient, to explain the newest of insights in the condition so as to obtain maximum cooperation in the proposed treatment program.

4. A recent editorial proposed that "it may well be better not to treat patients with our well known but hardly effective armamentarium of drugs". "In many patients with FM the problem is not so much FM, but psychosocial issues, inappropriate pain behavior and sometimes somatization".[16]

5. Aerobic exercise is effective in preventing physical deconditioning brought about by inappropriate rest and inactivity.

6. Cognitive Behavioral therapy when indicated appears to show promise.

- *Current findings on "disability"*

  1. It is estimated that between 10 - 12% of the general population experience chronic widespread body pain. Most do not see a physician for this symptom and proceed with the business of daily life.[17]

  2. The majority of fibromyalgia experts are presently in agreement that fibromyaliga patients are not physically impaired.

  3. Severe psychological distress in patients with fibromyalgia not only plays a significant role but also may lead to psychological impairment.

  4. "Physicians should discourage inactivity and disability in fibromyalgia patients because, if these are prolonged there is an adverse effect on the prognosis".[18]

  5. " We must halt the trend to label patients with FM as disabled, and we must interfere with the social trend toward encouragement of the disability concept".[19]

- *Current findings on the "etiology" of unexplained chronic body pain*

  1. No definitive cause for this unexplained somatic pain symptom, as well as for other unexplained somatic symptoms/syndromes has been found, but investigators now postulate a common pathophysiologic pathway or pathways.[20]

15
16
17
18

2. They now view these unexplained symptoms/syndromes as the result of a "process" of interrelated and interconnected influences.

3. These interrelated, and interconnected influences come from the environment, mind, brain and organ systems. Each interacts and influences the others. Authors refer to this etiology of illness as the Biopsychosocial Model of Illness.[21]

4. The old model of cause and affect, the BioMedical Model, which still applies to many diseases, has been abandoned for this group of unexplained, subjective, functional symptoms/syndromes.

5. Patients with either a genetic predilection or cultural determinants, (stressors) or both, for emotional vulnerability and fragility are the more likely candidates for the expression of their psychological distress as physical symptoms.[22]

6. The physical expression of psychological distress, most often brought on by a variety of stressors is referred to by the psychological community as "somatization," and thought by the medical community (neurophysiologists) to be the result of altered CNS function, the exact pathophysiology of which remains unresolved at this time.[23]

# SOME STATE OF THE ART REFLECTIONS GLEANED FROM RECENT FIBROMYALGIA RESEARCH:

1. Chronic widespread musculoskeletal pain (fibromyalgia) is seen as a continuum existing in the general population. The pain is mild in most individuals and does not require involvement with the medical community.[24]

2. The end of this continuum is composed of individuals with moderate to severe pain often accompanied by tenderness, fatigue, poor sleep and symptoms of concomitant psychological distress.[25]

3. Tenderness in discrete regions of the body (tender points) do not adequately define the pain of fibromyalgia. These individuals are more sensitive to musculoskeletal pain throughout their entire body, a reflection of their lowered pain threshold.[26]

---

20
21
22
23
24

4. Upon involvement with the medical community, the label of fibromyalgia is most often attached to these individuals to describe their widespread body pain. This label does not define a physical disease condition.

5. Fibromyalgia is best interpreted as a syndrome of functional symptoms. Each medical specialty has at least one of these medically unexplained or functional syndromes, not adequately explained by physical disease processes.

6. Current research studies in neurophysiology addressing stress induced changes in CNS chemical secretions, and studies in psychology addressing heightened somatization show encouraging signs in approaching an explanation of functional somatic syndromes.

7. "Education about the nature of this disorder is of paramount importance. Some patients who present with symptoms of FM want only to be told that this is a non progressive condition that is not causing damage or inflammation in the body".[27] The remainder need to have this explained to them.

8. Appropriate management of fibromyalgia patients consists of attention to all potential aspects of this biopsychosocial illness.

   i. Identification and amelioration of psychological and environmental physical stressors.

   ii. Identification of the nature and severity of all aspects of psychological distress underlying this syndrome and their appropriate treatment with pharmaceutical agents and psychological attention whenever necessary.

   iii. Physical and occupational therapy and rehabilitation attention as necessary.[28]

Treatment with a primary care physician, an internist, or a rheumatologist attending to all the aspects of the illness suffices in most cases. In cases presenting with severe psychological symptoms, a psychological consultation for evaluation and treatment is in order.

9. Fibromyalgia, when interpreted, approached and treated in this fashion affords the patient the best chance for continuing an active and productive life.

## Conclusion:

Much has been accomplished in fibromyalgia research in the last ten years, and much remains to be done. Today, most would agree, we have many answers that we did not have yesterday. More answers will come tomorrow. It is the duty of

26
27

all of us who deal those with fibromyalgia claimants to stay current with the latest findings. All of us at UnumProvident, claims consultants, nurses, vocational rehab consultants, psychologists, and physicians, need to acquaint ourselves with every new finding so as, to better serve our fibromyalgia claimants. Only in this way are we able to assist them and their physicians in their return to wellness.

## REFERENCES

1. Hunder GG. Editorial: The Use and Misuse of Classification and Diagnostic Criteria for Complex Diseases. Ann Intern Med 1998;29:___-___.

2. Ibid

3. Gabriel SF. Classification Of Rheumatic Diseases. In: Klippel JH, Dieppe PA, eds. Rheumatology, 2nd ed. London: Mosby, 1998:1:3.1.4

4. Ibid

5. Hunder GG. The Use and Misuse

6. Barsky AJ, Borus JF. Functional Somatic Syndromes. Ann Intern Med 1999;30:910-21.

7. Aaron LA, Buchwald D. A Review of the Overlap Among Unexplained Clinical Conditions. Ann Intern Med 2000;134 Supplement part 2:___-___.

8. Clauw DJ. Musculoskeletal Pain and Evaluation. In: Ruddy S, ed. Kelley's Textbook of Rheumatology. 6th ed. Philadelphia: Saunders, 2001: ___-___.

9. Hadler, NM, Fibromyalgia, Chronic Fatigue and other Iatrogenic Diagnostic Algorithms: Do labels escalate illness in vulnerable patients? Postgrad Med 1997;102:161

10. Clauw DJ. Elusive Syndromes: Treating the Biologic Basis of FM and Related Syndromes. Cleve Clin J Med 2000;68:___-___.

11. Clauw DJ. Questions and Challenges in the Diagnosis of Fibromyalgia Syndrome. Journal of Musculoskeletal Medicine 1999; Supplement

12. Ibid

13. Mikkelsson M, et al. Muscle and Bone Pressure Pain Threshold and Pain Tolerance in FM Patients. Arch Phys Med Rehabil 1992;73:___-___.

14. Goldenberg DL. Fibromyalgia Symptoms a Decade Later. Arch Intern Med 1999;159:___-___.

15. Wolfe F. Editorial: The Fibromyalgia Problem. J Rheumatol 1997;24:1247-49.

16. Ibid

16. Goldenberg DL. Fibromyalgia Symptoms a Decade Later

17. Ibid

18. Wolfe F. The Fibromyalgia Problem

19. Winfield JB. Pain in Fibromyalgia. Rheumatic Disease Clinic of North America 1999;25: __-__.

20. Engel GL. The Need for a New Model: A Challenge for Biomedicine. Science 1977;196:__-__.

21. Barsky AJ, Borus JF. Functional Somatic Syndromes. Ann Intern Med 1999;130:910-21.

22. Winfield JB. Editorial: Does Pain in FM Reflect Somatization? Arthritis and Rheum 2001;44:__-__.

23. Goldenberg DL. Soft Tissue, Fibromyalgia and Related Syndromes. In: Klippel JH, Dieppe PA, eds. Rheumatology, 2nd ed. London: Mosby, 1998:__-__.

24. Clauw, Daniel J. Elusive Syndromes

25. Granges G, Littlejohn G. Pressure Pain Threshold in FM Syndrome. Arch Phys Med Rehabil 1992;73:__-__.

26. Clauw, Daniel J. Musculoskeletal Pain and Evaluation

28. Sharpe M, et al. Innovations in Symptoms Management. Ann Intern Med 2001;134 Part 2 Supplement: __-__.

## IV.    SOME NOTABLE QUOTES ON FIBROMYALGIA

- Dr. George E. Ehrlich states in review of The Oxford Textbook of Rheumatology Vol. I & II, 2nd ed. "I am pleased that Brian Hazelman sees fit to end his discussion of fibromyalgia approvingly citing Simon Carette."

(Dr. Simon Carette states) " Physicians have taken an entity that existed for centuries, given it a new name and created a major health issue by elevating it in importance and suggesting it deserves disability coverage."

Dr. Ehrlich then goes on to state:
"This echoes statements in the Klippel-Dieppe (Rheumatology) Text I recently reviewed. Perhaps if enough texts address this contentious and subversive issue, the mischief caused by physicians who champion the painful symptoms as incurable and compensable disease and contrive causal relationships to trauma and childhood abuse can be mitigated."

Ehrlich, George E., Reviewer, JAMA, October 7, 1998, Vol.280, No.13: pp1198-1199

- Dr. Sherine E. Gabriel notes (in her chapter on Classification of Rheumatic Diseases in the 2nd edition of Rheumatology edited by John Klippel & Paul Dieppe) that Cohen and Quinter have challenged the usefulness of the diagnostic criteria for fibromyalgia and notes that they feel that the diagnostic criteria "convey no pathophysiological insight and that they have been validated via a circular argument in which the evidence on which the construct is based is taken as proof of its veracity."

  Cohen, M., Quinter, J., *Fibromyalgia Syndrome*, a Problem of Tautology. Lancet. 1993: 342: 906-909

- Dr. Milton L. Cohen states:
  "No distinctive tissue pathology, pathophysiology or psychopathology has been found."

  Cohen, Milton L. & Quinter, John L. Fibromyalgia, A Problem of Tautology. *The Lancet*:1993:342: 906-908.

- Dr. Arthur J. Barsky states:
  "Somatic distress and medically unexplained symptoms have always been endemic to daily life, but the social and cultural characteristics of each era shape the expression, interpretation, and attribution of these symptoms...

  Patients who have these symptoms today differ from their predecessors by being less relieved by negative findings...and less responsive to explanation, reassurance, and palliative treatment."

  Barsky, Arthur J., & Borus, Jonathan F. Functional Somatic Syndromes. *Annals of Internal Medicine*. 1999:130 (11): 910-921

- Dr. Warren D. Blackburn states:
  "There is no evidence that fibromyalgia is (a) crippling or incapacitating disorder or is a prodrome for a more serious illness."

  Blackburn, Warren D. Fibromyalgia. *Southern Medical Association – Southern Medicine*. 1998: 85(2): 3-5.

- Dr. Frederick Wolfe comments:  On tender points… "A notorious unreliable an manipulatable exercise."

  On patients with fibromyalgia… "There is mounting evidence that many patients have major affective, somatization, and personality disorders."

  On fibromyalgia… "There is little evidence to support that FM (fibromyalgia) is a disease, and many of us who helped develop the FM construct still consider it a syndrome."

  On treatment…"It seems clear that many FM treatment initiatives promote medicalization and prolong illness."

  The Fibromyalgia Problem. Frederick, Wolfe. *The Journal of Rheumatology*. 1997: 24(7): 1247-1249

- Dr. Nortin Hadler comments:
  On tender points… "I have serious reservations about asserting that tender points can be used to define a discrete pathological entity.  Many patients with all sorts of chronic illness – and some healthy persons – find the pressure of the examining finger uncomfortable."

  On fibromyalgia… "The debate rages as to whether the illness is a consequence of an underlying organ dysfunction or a form of illness behavior magnified by the medical model for care.  I am of the latter opinion."

  Fibromyalgia, Chronic Fatigue, And Other Iatrogenic Diagnostic Algorithms.
  Hadler, Nortin M. *Postgraduate Medicine*. 1997: Vol. 102, No. 2, 161-176

- Dr. Hugh Smyth comments:
  "We agree with Wolfe that '…tenderness can be manipulated up or down.'  Also, I fear that he may be correct, in that detection of exaggeration '…requires so much effort it almost will never be done.'"

  "The same could be said for effective treatment. It is our money that is being used for wrongful claims and for the twin industries of invalid assessments and subsidized but ineffective therapies."

  Fibromyalgia: Can One Distinguish It From Malingering?  More Work Needed; More Tools Supplied.
  Smyth, Hugh. *The Journal of Rheumatology*. 2000: 27(11): 2536-2539

- Dr. Daniel Clauw comments:
  On fibromyalgia…"Patients should be educated on the non-destructive nature of this condition, as well as the fact that meaningful improvement rarely occurs without  active participation on their part."

On therapies for fibromyalgia... "Cognitive behavioral therapy (CBT) has generally been shown to be successful in treating patients with chronic pain syndromes such as fibromyalgia, since it helps identify and eliminate maladaptive behaviors and substitutes more effective mechanisms for managing symptoms and improving functions."

"An exercise program for fibromyalgia patients needs to be designed with the goals of physical tolerance and long term compliance..." "The occurrence of post- exertional worsening of symptoms is reduced by utilizing low-impact conditioning programs, initiated at a slow pace (sometimes beginning at only 5 minutes per day) that is gradually increased over time."

Fibromyalgia Syndrome: An Update On Current Understanding And Medical Management. Clauw, Daniel J. *Rheumatology Grand Rounds*. 2000: 3(4)1-9

## V.   BIBLIOGRAPHY/REFERENCES OF FIBROMYALGIA

The following bibliography/references are not intended to represent a comprehensive review of all of the current literation on fibromyalgia, but rather are intended to provide support for the opinions/comments expressed in our position statements and our 2002 Understanding of Fibromyalgia.

1.  Patients Who Amplify Bodily Sensations
    Barsky III, Arthur J. *Annals of Internal Medicine.* 1979;91:63-70.

2.  1990 Criteria For The Classification Of Fibromyalgia
    Wolfe, Frederick & Smythe, Hugh, et al. *The American College of Rheumatology.* 1990: 33(2): 160-172.

3.  The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia, Wolfe, Frederick. *Arthritis and Rheumatism.* 1990:33:160-172.

4.  Fibromyalgia Syndrome, A Problem of Tautology
    Cohen, Milton L., et al. *The Lancet.* 1993:342:906-909.

5.  Fibromyalgia 20 Years Later:  What Have We Really Accomplished?
    Dr. Carrette. *The Journal of Rheumatology.* 1993; 590-593.

6.  Fibromyalgia Syndrome and Myofascial Pain Syndrome: Do They Exist?
    Bohr, Thomas W. *Neurologic Clinics.* 1995:13(2): 365-384.

7.  Is Fibromyalgia A Useful Diagnostic Label?
    Hadler, Nortin M. *Cleveland Clinic Journal of Medicine.* 1996:63 (2): 85-87.

8.  The Fibromyalgia Syndrome: A Consensus Report on Fibromyalgia and Disability.
    Wolfe, Fred *The Journal of Rheumatology.* 1996; 23(3): 534-539.

9.  What Is The Future Of Fibromyalgia?
    Goldenberg, Don L. *Rheumatic Disease Clinics of North America.* 1996; 22(2): 393-407.

10. Fibromyalgia And The Disability Dilemma.
    Bennett, Robert. *Arthritis & Rheumatism.* 1996;39(10): 1627-1632.

11. If You Have To Prove You Are Ill, You Can't Get Well.
    Hadler, Nortin *SPINE.* 1996: 21(20): 2397-2400.

12. The Relation Between Tender Points And Fibromyalgia Symptom Variables:  Evidence That  Fibromyalgia Is Not A Descrete Disorder In The Clinic
    Wolfe, Frederick. *Annals of Rheumatic Diseases.* 1997:56:268-271

13. The Fibromyalgia Problem
    Wolfe, Federick. *Journal of Rheumatology.* 1997:24(7):1247-1249.

14. Fibromyalgia -- Out of Control?  Comment.

Gordon, Duncan A. *The Journal of Rheumatology.* 1997: 24, 1247

15. 17. A 37-Year Old Man With Somatic Complaints.
Barsky, Arthur J. *Clinical Crossroads.* 1997: 278(8): 673-679

16. Fibromyalgia, Chronic Fatigue, And Other Iatrogenic Diagnostic Algorithms.
Hadler, Nortin M. *Postgraduate Medicine.* 1997: Vol. 102, No. 2, 161-176

17. Chronic Fatigue And Its Syndromes
Weasely, S., Hotopf, M., & Sharpe, M., et al. *Oxford University Press.* 1998

18. Fibromyalgia by Brian Hazelman
*The Oxford Textbook of Rheumatology*, Madison, P.J., et al., 2nd ed. 1998

19. Classification Of Rheumatic Diseases
Gabriel, Sherine E. *Rheumatology, Volume I Klippel, J. & Dieppe, P. 2nd education.* 1998: Section 1: 3.1-4

20. Fibromyalgia
Blackburn Jr., Warren D. *SMA Southern Medicine.* 1998:85 (2): 3-5

21. Work Disability And Soft Tissue Rheumatism
Reilly, Paul *The Journal of Rheumatology.* 1998:25(8): 1454-1455

22. Is Fibromyalgia A Distinct Clinical Entity? The Disapproving Rheumatologist's Evidence. Cohen, Milton. *Baillier's Clinical Rheumatology.* 1999:Vol 13, No. 3, pp. 421-425.

23. Functional Somatic Syndromes
Barsky, Arhtur J., et al. *American College of Physicians – American Society of Internal Medicine.* 1999:130 (11): 910-921.

24. Pain In Fibromyalgia.
Winfield, John B. *Rheumatic Disease Clinics of North America.* 1999: 25(1): 55-79

25. Functional Somatic Syndromes.
Barsky, Arthur J. & Borus, Jonathan F. *Annals of Internal Medicine.* 1999: 130(11): 910-921.

26. Questions And Challenges In The Diagnosis Of Fibromyalgia Syndrome.
Clauw, Daniel J. *The Journal of Musculoskeletal Medicine 1999; June Supplement, S7-S12*

27. How Can We Manage Fibromyalgia?
Reilly, Paul A.. *Annals of Rheumatic Diseases.* 1999: 125-126.

28. Hurting All Over
Groopman, Jerome *The New Yorker.* November 13, 2000: 78-92

29. Fibromyalgia Syndrome: An Update On Current Understanding And Medical Management. Clauw, Daniel J. *Rheumatalogy Grand Rounds.* 2000:3 (4): 1-9

30. 29. Fibromyalgia: Can One Distinguish It From Simulation? An Observer-Blind Controlled Study.

Khostanteen, Irene, et al. *The Journal of Rheumatology.* 2000: 27(11) 2671-2676

31. Sayin' "Stand And Deliver, For You Are A Bold Deceiver": Faking Fibromyalgia
    Wolfe, Federick. *Journal of Rheumatalogy.* 2000; 27(11):2534-2535

32. Fibromyalgia: Can One Distinguish It From Malingering?  More Work Needed; More Tools Supplied.
    Smyth, Hugh. *The Journal of Rheumatology.* 2000: 27(11): 2536-2539

33. Primary Care Rheumatology. Harris, Edward D. & Genovese, Mark C. *W.B. Saunders Company,*
    Philadelphia, 2000

34. Primary Care Rheumatology
    Howard, Edward D. & Genovese, Mark C. MD. *W.B. Saunders Company, Philadelphia, 2000.*

35. A General Population Study Of Fibromyalgia Tender Points (London Study)
    White M., et al. *The Journal of Rheumatolgy.* 2000: 27

36. Editorial - Testing Tenderness: What's The Point?
    Craft, Peter. *The Journal of Rheumatology.* 2000: 27

37. Fibromyalgia And Compensable Disability – Debate Over Medical, Socioeconomic, and Personal
    Ramifications. Clauw, Daniel J., & Hadler, Nortin M. *Medical Crossfire.* 2000: Vol 2, No.2, 50-61

38. Fibromyalgia by Clauw, Daniel J.
    *Textbook of Rheumatology,* Kelly, W., 6th ed. 2001. pp 417-423

39. Features Of Somatization Predict The Onset Of Chronic Widespread Pain.
    Macbeath, John, Macfarlen, Gary J., & Benjamin, Sidney & Silman, Alan J., et al. Arthritis *& Rheumatism.*
    *Vol 44, No.4, 2001, 4 Aril 2001, Manchester, U.K.*

40. Effort Testing in Patients with Fibromyalgia and Disability Incentives
    By Roger O. Gervais, Anthony S. Russell, Paul Green, Lyle M. Allen III, Robert Ferrari, and Stephanie D.
    Pieschl. *The Journal of Rheumatology, Vol. 28,* pp 1892-1899, 2001.

41. Disability Evaluation of Fibromyalgia
    By Claire V. Wolfe, MD. *Physical Medicine and Rehabilitation Clinics of North America, Vol 12, Number
    3, August 2001.* pp 709-719.

42. The Effects of Progressive Strength Training and Aerobic Exercise on Muscle Strength and Cardiovascular
    Fitness in Woman with Fibromyalgia: A Pilot Study.
    Rooks, DS., Silverman, CB., & Kantrowitz, FG. *Arthritis Rheum. 2002 Feb:* 47(1): 22-8

## VI.   A FIBROMYALGIA PROCESS PROPOSAL

If felt to be appropriate (as each claim is unique and is handled on its own merit) it may be helpful to initiate a partnering attempt with the insured and the insured's attending physician (and when appropriate with the insured's employer); in order to ensure that proper attention is being directed toward maximizing the insured's potential functional capabilities and to ensure that the treatment plan addresses appropriate return to work issues.

It is our belief that any such partnering attempts will be most successful if initiated as soon as possible (i.e. as soon as any period of disability is claimed or projected on the basis of fibromyalgia).   If after a period of time (determined appropriate for that specific case) the return to work partnering attempt fails within the determined appropriate period of time, one could then initiate a review to determine why the partnering attempt failed (See "Tools which may be helpful in addressing functional capabilities and claimed limitations in some reported cases of fibromyalgia.").

Day 1 – Day 5

- Initial phone call to claimant from Customer Care Specialist (CCS)
  (See Initial Call Template in Appendix)
  • Purpose: Information gathering, expectation setting
  – Please note each claim is unique and should be handled on its own

Day 6 – Day 10

- CCS discuss phone call findings with nurse, and nurse makes call to office
  (See Nurse to Physician's Office Call Template in Appendix)
  • Purpose: Information gathering

- After the nurse call and using the information gathered to this point, the CCS will make a call to the employer.
  (See Employer Call Template in Appendix)
  • Purpose: Convey informations regarding claim handling and gather information regarding return to work (RTW) possibilities.

- CCS to order medical records via fax from appropriate treating providers as identified by calls to claimant and primary physician office as advised by nurse using attached physician / psychologist template letters.
  • Purpose: Information gathering for RTW where appropriate and validation.

### Day 11 – Day 15

- CCS to call claimant to discuss activities to date (i.e., conversations thus far; records ordered and if necessary encourage claimant to assist with the gathering of records). During this call, CCS will get any updates from claimant and again set expectations regarding claim handling, RTW plan where appropriate.
  - Purpose: Expectation setting

### Day 16 – Receipt of Medical Records

- Follow up as needed to obtain all records ordered

- Call claimant if necessary to intervene if records not forthcoming

### After Receipt of Medical Records

- Clinical referral to nurse / physician / psychologist
  - Purpose: To evaluate support of impairment and identify RTW partnering potential

### After Review of Medical Records

- Physician / psychologist to determine if a physician peer to peer call is appropriate
  - Purpose: To clarify appropriate restrictions and limitations (R&L's) with treating provider and / or appropriate RTW plan

- Multi-specialty roundtable review of information on claim to date
  - Purpose: To differentiate claims to TEAM process vs. evaluation / validation
  (See TEAM Process for additional information)

  At this point the claim may be identified as one in which we will partner with claimant, employer and / or physician to effect an appropriate RTW or one which will primarily be managed with additional evaluation / validation activities. Multi-specialty roundtable conferences may be conducted with physician / psychologist in attendance. In the multi-specialty conference, if it is determined that partnering (TEAM) process will not be effective, an evaluation / validation activity plan will be discussed using vocational, clinical and consultant input. Claims identified as primarily Psych and not supported from general medical condition will be transferred at this point to the appropriate impairment unit.

- CCS should have frequent phone contact with the claimant – at a minimum, once a month and preferably every 2 weeks
  - Purpose: Track claimant's progress

### TEAM Process for Fibromyalgia Claims*
*(Please note each claim is unique and should be handled on its own merit)

Fibromyalgia claims with active RTW plans will be handled in the TEAM process. These claims will often have some of the following characteristics:

- A claimant who is motivated to return to work in the near future
- An attending physician who is supportive of a return to work plan
- A claimant who is receiving appropriate care (i.e., participating in exercise, cognitive behavioral therapy, etc.)

- An employer who is supportive of a return to work plan through a willingness to accommodate as required by the plan

Managing the claim in the TEAM process will provide:

- A formalized process to carefully monitor the appropriate care and the clinical progress of the claimant
- A forum for discussing the claimant's RTW progress with the claimant, physician and employer
- A successful return to work generally within 2-3 months from the implementation of the return to work plan barring unforeseen circumstances
- An effective use of vocational resources to work with the employer to remove most, if not all, RTW barriers
- Frequent communication with the claimant by the Team nurse and CCS to insure the return to work plan is successfully implemented and providing the desired outcomes (No more than 2 weeks without a call)

If RTW is unsuccessful within an appropriate timeframe, initiate steps to determine the underlying cause of the failed RTW plan. This might include an evaluation and validation of the claimed diagnosis and an assessment of the claimed degree of limitations.

**IV.    TOOLS WHICH MAY BE HELPFUL IN ADDRESSING FUNCTIONAL CAPABILITIES AND CLAIMED LIMITATIONS IN SOME REPORTED CASES OF FIBROMYALGIA**

—  In order to most appropriately address an insured's claimed degree of limitations and functional capabilities, an understanding of the specific activities which the insured feels that he / she is incapable of performing and an understanding of the reason why they insured feels incapable of performing any such activities is needed.  It is also helpful to have understanding of the activities an insured continues to feel capable of performing.  This information is also needed to most appropriately utilize any of the following tools.

—  **The following tools may be helpful in addressing claimed limitations and functional capabilities and in addressing the reasons for a failed return to work partnering attempt.**

- Clarifying actual daily activities
- Appropriately focused Functional Capacity Evaluations (FCE's)
- Neuropsychological testing evaluations
- Independent medical evaluations (IME's)
  (From a medical / physical standpoint or from a psych / neuro-psych standpoint)
- Panel IME's  (multi-specialty) consisting of a combination of medical and or psych specialists.

—  Please remember that each case is unique and needs to be addressed on it's own individual merits. In any individual case it may be appropriate to utilize one, none, or a combination of the following tools.

- **Clarifying Actual Daily Activities**

  Clarifying ones actual daily activities provides us with an understanding of what the claimant is "at least" or at a minimum able to perform (i.e. the "minimum" at which that claimant would be expected to perform on a formal FCE).  A claimant may certainly be found capable of doing significantly more on an FCE, but it would be inconsistent for that claimant to perform at a lower level on a FCE.  The above information may be helpful in determining whether one's claimed or reported limitations are consistent with reality.

- **Appropriately Focused Functional Capacity Evaluation (FCE's) with appropriate validity/credibility checks.**

## FUNCTIONAL CAPACITY EVALUATIONS OF PATIENTS WITH FIBROMYALGIA AND/OR OTHER MEDICALLY UNEXPLAINED SYMPTOMS (SUCH AS CHRONIC FATIGUE SYNDROME)

The choice of whether or not to include a standardized functional capacity evaluation in the overall assessment of a claimant with a diagnosis of fibromyalgia is based on careful medical analysis of the data in the file. Because many patients with the classic symptoms included in the fibromyalgia construct ( pain and fatigue) will self-limit and not perform with full voluntary effort, the results may be significantly less than helpful and frequently invalid. Suboptimal efforts at physical activity, symptom magnification, and a cognitive belief system that they should not physically exert themselves if accompanied by pain frequently distorts the actual physical capacity findings.

Because there is a great deal of data about actual physical capacity that can be obtained from a detailed description and analysis of daily activities and the degree of self-limitation, an FCE may not contribute a great deal of additional data unless the claimant is motivated to return to work and is therefore likely to sincerely put forth the amount of effort required to assess actual physical capacity. A suboptimal exam with poor validity, reliability, and consistency does not support a conclusion of decreased capacity; rather it will describe an individual who may be capable of far more capacity than demonstrated.

Functional performance measures in claimants who have symptoms of fatigue and pain such as those diagnosed with fibromyalgia pose a special challenge, especially in the context of "impairment and Disability". Therefore, professionals performing a functional capacity evaluation (FCE) should have a strong clinical knowledge of musculoskeletal, neurological, and psycho-social evaluations, including ways of testing for validity, maximal effort, and symptom magnification a physical therapist or occupational therapist should perform the evaluation rather than their assistants. If a complex upper extremity evaluation is required, an occupational therapist with additional training as a certified hand therapist is preferred.

The patient should have an opportunity to repeat activities that were deemed invalid to assist in the final determination of validity.

A standard FCE for a fibromyalgia claimant, based on work with chronic pain patients in general, should include range of motion measures of each joint, measures of strength, lifting capacity, grip strength

Activities used to establish validity should be performed early in the testing procedure if the evaluator feels the patient may have difficulty with completing the full evaluation. Therefore, the evaluator needs to be flexible in the order of activities being requested. Casual observation of the patient's activities during the waiting room and between activities may assist in supporting validity.

<u>Most common validity and credibility testing should include</u>

- multiple position grip strength testing (looking for bell shaped curve)

- heart rate response to activities (noting change of heart rate with difficult activities or pain)

- appropriate correlation of pain behaviors with activities being performed

Other validity testing normally performed during various FCE protocols will assist in establishing validity, current level of function, and areas in need of rehabilitation.

A well-performed FCE will assist in establishing current functional status and current recommended restrictions and limitations.

FCE needs to include observed activities as well as a detailed musculoskeletal and neurological evaluation.

FCE providers should also include their own Validity and Reliability measures. Raw data should be included in the report and support conclusions in regard to stated Validity and Reliability.

- Gervais, RO Effort Testing in Patients with Fibromyalgia and Disability Incentives  J Rheum 2001; 28: 1892-9
- Gatchel, RJ, ed  Psychological Factors in Pain: Critical Perspectives, Guilford Press, 1999

- <u>Neuropsych Testing / Evaluations</u>

The neuropsychological evaluation / testing assesses specific, cognitive skills. In summary, the neuropsychological evaluation / testing is most useful when there are specific complaints of cognitive dysfunction, when there are strong suggestions of cognitive dysfunction even without explicit claims, or when there is a need to determine whether or not there is a likely neurological condition underlying the claimant's complaints. Records review, formal testing for motivation and effort, and formal assessment of overall psychological functioning should routinely be included along with a formal assessment of neurocognitive capabilities. Recommendations for cognitive rehabilitation, if appropriate, would ideally be a part of the report.

<u>In cases of fibromyalgia and other symptoms of medically unexplained symptoms two types of neuropsychological batteries are proposed:</u>

1. A screening or sampling battery would be useful in cases where cognitive complaints are made either by an Insured or by treating provider but these are not supported by formal psychological/neuropsychological evaluation. In this case, we might want to obtain our own brief but formal neuropsychological evaluation. This battery should sample the relevant areas of cognitive functioning as well as comprehensively assessing effort/motivation and emotional/personality functioning. This battery would consist of the basic WMS-III along with an abbreviated WAIS-III (perhaps omitting one subtest from each of the two scales); a test of motor speed (either Finger Connor's CPT-II); and two measures of frontal/executive functioning (Trial Making and either the Category Test of Wisconsin Card Sorting Test). Additionally, two comprehensive tests of cognitive symptom validity (TOMM; WMT, CARB, Victoria, VIP) and either the MMPI-2 or PAI would be needed. The time needed for this battery should be substantially less than that required for the full neuropsychological evaluation. This battery is intended to serve as a means for determining objectivity of claimed impairment or for assisting in determining the direction of appropriate treatment. The screening battery should require about two thirds the time (administration, scoring and reporting) of a full battery.

2. The full neuropsychological evaluation battery may be used as a follow up to the screening battery or as an initial battery when an Insured's treatment provider has submitted a formal cognitive assessment that was felt to be inadequate for our evaluation of the claimed condition. The full neuropsychological battery does not always need to be done as a follow-up to the above screening battery. The full battery typically includes The Wechsler Adult Intelligence Scales (WAIS-III), The Wechsler Memory Scale (WMS-III), The Halstead-Reitan Battery, comprehensive evaluation of emotional/personality functioning (MMPI-2, MCMI-II or PAI), and two comprehensive tests of cognitive symptom validity (TOMM; WMT, CARB, Victoria, VIP). These tests and batteries have been selected because of their acceptance in the medico-legal arena, their inherent statistical properties and the fact that they yield overall indices as well as more specific test or subtest scores.

## • Independent Medical Evaluations (IME's) and Panel IME's

In cases where limitations are claimed on the basis of fibromyalgia or other syndromes of medically unexplained symptoms (such as chronic fatigue syndrome), it is often helpful to discuss the file in a multi-specialty roundtable type conference with combined medical/physical and psych/neuropsych input.

The combined medical / psych multi specialty approach is helpful in determining whether any additional information may be needed from either a medical /physical standpoint or from a psych/neuro-psych standpoint. Furthermore, the above type of multi specialty discussion helps ensured the most appropriate utilization of any one or combination of above tools.

### How to better document subjective cognitive and psychological complaints related to defined conditions with medically unexplained symptoms (such as fibromyalgia or chronic fatigue syndrome)

As the term suggests, a defined condition with medically unexplained symptoms is characterized by reported symptoms and the individual's perceived suffering. The claims are often accompanied by reports of psychiatric symptoms or diagnoses (e.g., depression, anxiety, adjustment disorder) and/or complaints of cognitive dysfunction (e.g., disrupted concentration, memory, or attention). Sometimes, either the claimant's attending physicians or the in-house medical reviewers will have suggested a possible somatoform disorder. Because of these issues, such conditions (e.g., Fibromyalgia and Chronic Fatigue Syndrome) have also been termed "Functional Somatic Syndromes".

The favored initial approach to a claimant reporting these problems is to solicit a partnership in which the claimant, his/her physician, and the company cooperate in a concerted return-to-work effort. An evaluation and validation of claimed impairments may be needed during this process or if this collaborative process is not possible. One potential means of validation is the Independent Medical Examination (IME). When psychological and/or cognitive concerns are a claimed basis for disability, or when they are strongly suspected based on the implications of obtained medical records, a Psychological, Psychiatric, and / or Neuropsychological IME may be warranted.

- The emphasis of a psychological IME is on psychological functioning and the impact of emotional issues on functional capacity. In the psychological IME the emphasis is on emotional concerns with a screening assessment of cognitive capacities, as compared to the neuropsychological IME in which the emphasis is on a complete evaluation of cognitive capacities with a screening evaluation of emotional functions. Like the more comprehensive neuropsychological evaluation, the psychological IME should include records review and formal assessment of motivation and effort. Recommendations for remediation of psychological distress, such as through specific suggestions for psychotherapy, would ideally be a part of the report. The psychological tests typically used in this type of evaluation might include the MMPI-2, MCMI-III, PAI, Patient Pain Profile, Millon Behavioral Medicine Diagnostic. Cognitive screening in this type of evaluation is usually accomplished via a comprehensive mental status examination during clinical interview. If a more in-depth cognitive evaluation is needed, refer to one of the Neuropsychological IME's below.

- A psychiatric IME also has many of the same features as the psychological IME, but the emphasis is on psychiatric diagnosis and an evaluation of appropriate medical care for a psychiatric condition. Here, a detailed formal Mental Status Evaluation would help screen for cognitive dysfunction, but the emphasis is on psychiatric interviewing and diagnosis. The psychiatrist involved would also be expected to review records and assess motivation and effort by comparing observed behavior to information contained in the records. The main advantage of a psychiatric IME is in obtaining evaluations of current medication effects on functioning, as well as recommendations regarding what would be appropriate care and/or follow up testing.

- The neuropsychological IME is most useful when there are specific complaints of cognitive dysfunction, when there are strong suggestions of cognitive dysfunction even without explicit claims, or when there is a need to determine whether or not there is a likely neurological condition underlying the claimant's complaints.

## CHOOSING THE TYPE OF IME

1. If cognitive complaints are a prominently claimed source of impairment, and particularly if there is any documentation in the file of previous cognitive testing or mental status examination that supports the claimed limitations, a neuropsychological IME is probably the most appropriate venue.

2. If psychological symptoms are a prominent complaint, but cognitive complaints are not claimed or indicated, then psychological testing may help clarify the issues involved. This is particularly relevant when the psychiatric symptoms are said to be impairing daily functioning, but there is no "hard" data to determine the extent of the impact. Cognitive screening should be included, but it need not be the main focus of the examination unless the screening demonstrates the need for further assessment.

3. Sometimes a combination of a psychological and psychiatric IME may be indicated. This is particularly true when there are questions regarding the combination of diagnosis, level of impairment, and credibility. Most often, the psychologist assesses the claimant first, with the report sent to the psychiatrist, who is the lead author of the report.

4. When credibility is a significant concern, it is sometimes helpful to suggest a specifically forensic evaluation, emphasizing issues of congruence between medical records, test results, and observed behavior.

5. If further input is felt to be needed on an IME basis from a medical / physical standpoint, then such input (in cases of fibromyalgia) might potentially be obtained by one of a number of appropriate medical specialists. Such an appropriate specialist might include a physiatrist, a rheumatologist, an internist, an occupational medical specialist, a neurologist, or other medical specialty (depending on the details of the case and the specific questions being asked of the IME).

6. A Functional Capacity Evaluation (FCE) could be obtained (see above) on a IME basis; and might, depending on the individual case, be obtained in conjunction with an evaluation by one of the above specialists (i.e. a physiatrist), or might be utilized in conjunction with another of the above tools.

7. A medical / physical IME component might be combined with a psych or neuro-psych IME component in certain situations (depending on the details of the individual case and the specific questions asked of the IME). In such cases it is often helpful for us to discuss the file in a multi-specialty roundtable type conference (with combined medical / physical and psych / neuro-psych input). The above multi-specialty approach may help in selecting the most appropriate specialties for a panel type IME. Such an approach may also be helpful in insuring that our concerns are appropriately conveyed to the IME, and that the IME receives all of the information required to accurately address our questions regarding the insured's condition and functional capabilities.

# CONTRIBUTORS

Edward C. Alvino, MD
Robert N. Anfield, MD, JD
Nancy Ball, MD
Norman Bress, MD
Alan Cusher, PhD
Marianne Justin
Les Kertay, PhD
Paul Martin, MD
Burton McDaniel, MD
Thomas McLaren, PhD

# APPENDIX – FIBROMYALGIA PROCESS PROPOSAL

- <u>Customer Care Specialist Material</u>

  - Fibromyalgia Initial Call Template
  - Employer Call Template

- <u>Clinical Material</u>

  - Nurse to Physician's Office Call Template
  - Physician Peer to Peer Call Template

## CCS-FIBROMYALGIA INITIAL CALL

Hello Mr(s). _____. My name is _____ and I will be the Customer Care
Specialist handling your claim for Long-Term Disability benefits. If it is o.k. with you, I would like to take a
few minutes in order to obtain an understanding of your current medical condition and discuss how we can
assist you with returning to work.

As your Customer Care Specialist, I am responsible for obtaining an understanding of your current ability to
return to work. During this evaluation, I will be partnering with you along with our medical and vocational
resources as well as your treatment providers and (if appropriate) your employer in order to pursue a plan that
will allow you to have a smooth transition back into the work force. Additionally please be aware that while we
are pursuing your return to work, we will also be evaluating your eligibility for benefits according to the
provisions of the policy under which you are covered.

Following our discussion of your medical condition, I will explain to you the applicable policy provisions in
your policy and allow you to ask any questions you may have regarding your policy.

HISTORY

- To the best of your recollection, what were your first symptoms and when did they begin?
  (Consider getting records from that point; such records may be)
- What physicians have treated you for this condition and how were they diagnosed?
- How have your symptoms progressed since being diagnosed?
- What is your understanding of this condition?
- How did you come to the decision to stop working?
- How has the progression of your symptoms affected your ability to perform your occupation?
- If you were to return to work today, what parts of your job would you be able to do? What parts would be
  difficult for you? Can you think of any accommodations that your employer could make that would help
  you be able to work at your job?
- Did you ask for or did your employer make any accommodations for you while you were still at work? If so
  what were they and when were they made?
- Can you think of any accommodations, which could be made in order to allow you to continue working?
  Have you discussed these with your employer?
- Tell me about other medical conditions that you are receiving treatment for.
- Have these conditions ever required you to miss work for an extended period of time?
- Are you able to drive? (esp. if cognitive deficits are claimed)

TREATMENT PLAN

- What is your physician's treatment plan? Have you and your physician discussed a return to work plan?
- What parts of your treatment plan seem to be helping the most?
- How do you measure improvement in your condition?
- How is your returning to work being incorporated into this plan?
- When do you anticipate this return to work occurring?

- What treatment providers have you seen and which are you currently seeing?
- Whom would you consider as your primary doctor? Would this be the doctor who would be responsible for your return to work plans?
- When was your most recent doctor's visit(s)? What visits do you have planned in the near future?
- Are you exercising regularly or doing physical therapy as part of your treatment plan?
- What medications including any herbal medicines or supplements are you currently taking? How long have you been taking these medications and have there been any recent changes? Who is prescribing these medications?
- Have you been referred to a psychologist, psychiatrist, counselor, or pastor for counseling or for testing?
- Have you received Cognitive Behavioral Therapy or discussed Cognitive Behavioral Therapy with your doctor?
- What testing has been completed, or is planned to be completed? What were the findings of these tests?

## EMPLOYMENT

- Can you please explain to me your exact duties of your occupation?
- Have there been any changes in your duties within the last two years?
- Did you enjoy your job? What part of your job did you enjoy the most and what part did you find the most challenging?

## SOCIAL

- How do you spend your day? Can you please describe how these activities have changed?
- What parts of your regular household duties are you still able to do and what parts have become more challenging?
- Do you have children? (ages) Are you the sole caregiver for your children?
- Does someone currently assist you with your household duties. What assistance do they provide?

- Have you applied for or are you receiving any other disability benefits?
- Is there any activity that energizes you or makes you feel better?
- Are you involved in any outside activities such as social groups or support groups? How often do these groups meet?
- Do you have anyone with whom you speak regularly about your condition?

# FIBROMYALGIA – EMPLOYER CALL

## Setting Expectations with the Employer

Gather Information
- Clarify the insured occupational duties as described by the insured in the initial telephone call
- Ask if there have been any recent job changes/responsibilities
- Ask if the insured is still employed
- Ask if the job description we have in our files accurately describes the duties of the insured
- Performance Issues
- Ask if there have been any visible changes in productivity and if so, when did they start?
- Ask if the insured has experienced any personal conflicts at work – i.e., issues with coworkers or supervisors

Discuss Return to Work Options
- Establish employer's willingness to accommodate
- Ask if employer desires to have the insured return to work
- Discuss and verify any suggested accommodations required for the insured to return to work
- Ask if insured has indicated to the employer that he wants to return to work and his plans for doing so

# NURSE TO PHYSICIAN'S OFFICE CALL

In order that we may obtain a more complete understanding of our insured condition, our Clinical resources will be contacting the treating physicians office for medical information regarding our Fibromyalgia claimants current diagnosis, treatment, medications, restrictions and limitations and prognosis. We anticipate that this call will help determine where the claimants are in their treatment plan (or lack of) and prognosis.

– How long has (patient's name) been seeing (physician's name)?
  - What is the frequency of treatment?
  - Last appt?
  - Next appt.?

– What are the current diagnoses/complaints listed in the records?

– What medication is the patient currently taking?

– What other physicians, health care professionals, exercise or physical therapists, etc. has the patient been referred to?

– Have you performed any formal mental status examinations?

  - Did you note any abnormalities?

– Are you aware of any evaluation or treatment by a psychiatrist, psychologist, or counselor?

  - Are you aware of any formal psychological or neuropsychological testing that has been done?
  - Are you aware of any referrals for evaluation or treatment along these lines?

– Does the claimant complain of depression, anxiety, panic attacks, insomnia, trouble eating, and memory problems, problems with concentration or any other cognitive functions?

– Please fax copies of recent lab work (diagnostic testing) i.e., MRI, CT scans, EMG, EEG, EKG, NCS, x-rays, etc.

– Does it appear that he/she is progressing, remaining stable, or regressing?

– Are there services (our vocational/case management staff) could offer to (insured's name) which would assist in restoring (insured's name) to his predisability functional capabilities?

**Please add any additional information that you believe would be helpful.**

# PHYSICIAN PEER TO PEER CALLS

## CLARIFICATION OF FUNCTIONALITY

<u>**Are you open to discussion on how we might work together to help return your patient to work?**</u>

**In what way is the patient functionally impaired?**

1. What is their activity level?
   - Can they work? Can they work in their occupation?
   - Shop?
   - Travel?
   - Drive?
   - Do household chores?
   - Care for children?
   - Care for self?

2. What impact, if any, has there been on patient's ADL's?

3. What objective measurements have been obtained to support impairment?

4. Has there been graded exercise testing either on a treadmill or a cycle-ergometer to determine maximum energy expenditure?

5. If there is range of motion impairment noted in the file, has the ROM impairment been measured (e.g., with a goniometer?) "Pain with no ROM limitation constitutes no impairment." (article in Journal Of Insurance Medicine 2001, volume 33:170-182)

## COGNITIVE ISSUES

Has the insured complained of problems with memory, concentration, or other cognitive functions? Have you observed problems in these areas?

1. How have they been documented?
2. Formal Mental Status Examinations? If so, what were the results?
3. Formal neuropsychological testing? If so, what were the results, or can you tell us who did the testing? If not, have you considered testing in any way?

**Has the claimant complained of or exhibited signs of depression, anxiety, appetite changes, sleep disturbance, or any other psychiatric symptoms?**

AUG-01-2003 FRI 01:44 PM PHILLIPS & ANGLEY     FAX NO. 6172273992     P. 38
Case 4:15-cv-40146-TSH   Document 74-22   Filed 12/12/16   Page 38 of 38

AUG 01 2003 13:42 FR PIERCE ATWOOD     912077911350 TO 1152#8108#7511#1 P.39/39

1. How have you addressed these?
2. Has there been a psychiatric referral?
3. A referral for psychotherapy or counseling?
4. To what extent do you think these issues impact the insured's symptoms?
5. Do you think there are functional issues that impact the symptoms, such as poor motivation, symptom magnification, secondary gain, job-site or home stress, or a tendency to express emotional issues through physical complaints?
6. If the patient wanted to return to work, would you support this?

## THERAPY

1. What therapy has been tried?
2. What has been the response?
3. How about non-pharmacological intervention?
4. Cognitive behavioral therapy?
5. Exercise based therapy?
6. Has occupational therapy been tried?
7. What was the impact?

## RETURN TO WORK

If the patient wanted to return to work, would you support this in his/her occupation?

1. Discuss the benefits of return to work on patient's overall health and well being.
2. Discuss UnumProvident's return to work philosophy and how we are willing to commit clinical and vocational resources to partner with the treating provider and employer to help patient/claimant return to work.
3. Discuss negative aspects of discontinuing work.

37