UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

| | | |
|---|---|---|
| **JUDITH KAMERER** | ) | |
| | ) | |
| | ) | **CIVIL ACTION** |
| **Plaintiff,** | ) | |
| | ) | **NO. 15-CV-40146** |
| **v.** | ) | |
| | ) | |
| **UNUM LIFE INSURANCE COMPANY OF** | ) | |
| **AMERICA; PROVIDENT LIFE AND** | ) | |
| **ACCIDENT INSURANCE COMPANY;** | ) | |
| **and UNUM GROUP** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____ )

## ORDER AND MEMORANDUM ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
### (Docket Nos. 94 & 97)

**September 21, 2018**

**HILLMAN, D.J.**

Pending before the Court are cross-motions for summary judgment in this action brought under the terms of the Employee Retirement Income Security Act of 1974 (ERISA).  For the reasons set forth below, Plaintiff's motion (Docket No. 97) is ***granted*** and Defendants' motion (Docket No. 94) is ***denied***.  Plaintiff's long-term disability benefits are hereby reinstated and she is to be compensated for past benefits due.

### Background

### *1.   Plaintiff's Policies*

The Plaintiff, Judith Kamerer, initiated this action seeking judicial review of Unum Life Insurance Company of America ("Unum Life"), Provident Life and Accident Insurance Company ("Provident Life"), and Unum Group's decision to terminate her long-term disability benefits.

Plaintiff was covered under two separate policies.  The group policy issued by Unum Life (the "LTD Policy") and the individual policy that she purchased to supplement her basic coverage issued by Provident Life (the "IDI Policy").  (Administrative Record Volume I).[1]

The LTD Policy defines disability as follows:

You are disabled when Unum determines that:

-you are limited from performing the material and substantial duties of you regular occupation due to your sickness or injury; and
-you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

You must be under the regular care of a physician in order to be considered disabled. (GRP-PLN-17).

Regular Occupation is defined in the LTD Policy as:

The occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location. (GRP-PLN-43).

The LTD Policy also states that benefits are no longer payable when any of the following occur:

-when you are able to work in your regular occupation on a part-time basis but you choose not to.
-if you are working and your monthly disability earnings exceed 80% of your indexed monthly earnings, the date your earnings exceed 80%.
-the end of the maximum period of payment;
-the date you are no longer disabled under the terms of the plan, unless you are eligible to receive benefits under Unum's Rehabilitation and Return to Work Assistance program;
-the date you fail to submit proof of continuing disability;
-The date you die. (GRP-PLN-24).

The IDI Policy defines total disability as follows:

---

[1] Administrative Record consists of 25 volumes. Volume I contains the two policies. The Group Plan is Bates stamped UA-POL-578456-000001-000047.  For ease of reference, it will be referred to as GRP-PLN-1-47.  The Individual Policy is Bates stamped PLA-POL-IDI-06159714-000001-000030.  For ease of reference, it will be referred to as IDI-POL-1-30.  The remainder of the record has been divided into two separately bate-stamped files for Plaintiff's separate IDI and LTD claims.  Hereinafter, "ARIDI" refers to Unum's claim file for Plaintiff's Individual Disability claim and "ARLTD" refers to Unum's claim file for Plaintiff's group LTD claim.

Total Disability or Totally Disabled means that because of Injuries or Sickness:

1. You are unable to perform the material and substantial duties of Your Occupation; and
2. You are not engaged in any other occupation; and
3. You are receiving Physician's Care. We will waive this requirement if We receive written proof acceptable to Us that further Physician's Care would be of no benefit to You. (IDI-POL-13)

"Your Occupation" is defined in the IDI Policy as "The occupation or occupations, as performed in the national economy, rather than as performed for a specific employer or in a specific location, in which You are regularly engaged at the time You become Disabled." (IDI-POL-13).

The LTD Policy limits all disabilities due to a mental illness to a cumulative benefit period of 24 months. The LTD Policy defines mental illness as:

A psychiatric or psychological condition classified in the Diagnostic and Statistical Manual of Mental Health Disorders (DSM), published by the American Psychiatric Association, most current as of the start of a disability. Such disorders include, but are not limited to, psychotic, emotional or behavioral disorders, or disorders relatable to stress or to substance abuse or dependency. If the DSM is discontinued or replaced, these disorders will be those classified in the diagnostic manual then used by the American Psychiatric Association as of the start of a disability. (GRP-PLN-42).

The IDI Policy states that if the disability is caused by a mental disorder the maximum benefit period is also 24 months over the life of the policy. (IDI-POL-8, 21).

Mental Disorders are defined as follows:

Any disorder (except dementia resulting from stroke, trauma, infections or degenerative diseases such as Alzheimer's disease) classified in the Diagnostic and Statistical Manual of Mental Disorders (DSM), published by the American Psychiatric Association, most current as of the start of a Disability. Such disorders include, but are not limited to psychotic, emotional or behavioral disorders, or disorders relatable to stress or to substance abuse or dependency. If the DSM is discontinued or replaced, these disorders will be those classified in the diagnostic manual then in use by the American Psychiatric Association as of the start of a Disability. (IDI-POL-11).

2. *Plaintiff's Medical History and the Termination of Benefits*

3

On June 20, 1988, Ms. Kamerer began working at Accenture. (ARIDI at 372). She worked continuously at Accenture until becoming occupationally disabled in January 2004. (ARIDI at 382). Her last position at Accenture was Associate Partner, which paid an annual salary of $155,400. (ARIDI at 373l; ARLTD at 5445). Ms. Kamerer became disabled due to fibromyalgia, inflammatory arthritis, hypothyroid and insomnia, which she contends caused her constant pain in her joints, severe headaches, and "fibro-fog." (ARIDI at 363; 372; 377; 380). She was prescribed numerous medications including OxyContin, Lortab, Actiq, Suboxone, Phenergan, Maxalt, and Zonegran to treat her pain. (ARLTD at 308; 5155; 5158).

Ms. Kamerer concurrently struggled with depression. (ARLTD at 308). In January 2004, Ms. Kamerer reported being depressed over having lost her job and having a child in the hospital. (ARLTD at 308). In February 2004, her arthritis specialist, Dr. Katz, noted that Ms. Kamerer had fibromyalgia and that depression could be playing a role in her condition. (ARLTD at 255). A month later, Dr. Katz noted that Ms. Kamerer's condition was "a classic fibromyalgia picture" but "[a]s is typical with pain syndromes, it has been difficult to establish whether her depression has been primary or secondary." (ARLTD at 167).

In February of 2004, she filed claims for benefits under both policies. (ARIDI at 361-377). On May 10, 2004, Unum approved her claim under both policies. (ARIDI 594-597). In 2008, Ms. Kamerer's claim was assigned to the extended duration unit. (ARIDI at 342-343). Unum paid Ms. Kamerer's benefits uninterrupted for the years 2004-2013. (ARIDI at 2647-2657).

Subsequent to the initial approval of her claim and throughout its administration, Ms. Kamerer was required to submit periodic claimant statements, attending physician statements, and both Unum Life and Provident Life had periodic contact with Ms. Kamerer regarding her condition. (ARLTD at 438-444; 522-526; 879; 968; 1061-1064; 1124). During this time, Ms.

Kamerer did provide extensive records to Unum from her treating healthcare providers, principally a neurologist, urologist, and psychologist. (ARIDI at 197- 230; 248; 253; 362; 376; 380; 540-543; 548-549; 561-580; 617-718; 788-808; 814-839; 849; 852-853; 908-921; 923; 928; 940-945; 948-950; 962-964; 977-1083; 1092-1135; 1282-1430; 1432-1580; 1583-1761; 1763-1837; 1857-1865; 1875-1883; 1888-1890; 1909-1953; 1958-1959; 2001-2002; 2073-2086; 2092; 2241-2247; 2255-2256; 2382-2383; 2423-2425; 2439-2440; 2462-2463; 2480-2481; 2494-2495; 2559; 2566-2569; 2590-2593; 2595-2598; 2615-2617; 3271; 3297-3298; ARLTD at 5299-5310).

When her symptoms failed to improve, Ms. Kamerer sought treatment at the Mayo Clinic. (ARIDI at 749-772).   Doctors at Mayo also found that Ms. Kamerer had "symptoms and findings . . . consistent with the diagnosis of fibromyalgia" and subsequently entered her into the Fibromyalgia Treatment Program. (ARIDI at 755; 759).   She also sought treatment at Mayo for her depression. (ARLTD at 353-355).   Doctors at Mayo subsequently recommended admission to the Mood Disorder's Unit at Mayo for treatment of her depression. (ARLTD at 354-355).

In July, 2013, Charlene Saucier, a Clinical Consultant, performed a review of Ms. Kamerer's medical history. (ARLTD at 3042-3049).   In an interview shortly before that review, Ms. Kamerer told Unum representatives that she was being treated by Dr. John Gamble, Dr. Holly Kaufman, and Dr. Jim Lemons. (ARLTD at 2952-2953).   Dr. Gamble gave Ms. Kamerer no work restrictions. (ARLTD 2982-2983).   Dr. Kaufman suggested that Unum contact Ms. Kamerer's pain management specialist. (ARLTD at 3000).   After Dr. Gamble left his practice, Ms. Kamerer began seeing Dr. Karan Baucom (ARLTD at 3060).   Dr. Baucom, who was treating Ms. Kamerer for addiction, did not provide any restrictions on Ms. Kamerer returning to work. (ARLTD at 3087).

On September 6, 2013, Unum notified Ms. Kamerer that her benefits under the LTD Plan would be discontinued after its medical department reviewed her file and determined that she had

the functional capacity to return to her job. (ARIDI at 2520-2525; ARLTD at 3220-3225).   On

September 10, Unum also terminated Ms. Kamerer's benefits under the IDI Plan. (ARIDI at 2521).

Unum's vocational review classified Ms. Kamerer's occupation as a Systems Project Manager and

an internal medical reviewer concluded that she had the functional capacity to meet the physical

demands of that occupation. (ARIDI at 2829).   According to the vocational review, the physical

demands associated with a Systems Project Manager included, among other demands, exerting up

to 10 pounds of force occasionally and a negligible amount of force frequently to move objects.

The occupation is sedentary and required sitting most of the time, but might include "micro-

breaks" such as walking or standing for brief periods.   Finally, the review noted that the position

ordinarily mandated travel, the frequency of which would be job specific. (ARLTD at 3021).

According to Unum, Ms. Kamerer was able to satisfy the functional demands of this job as she

was capable of working full-time while sitting frequently, standing or walking on occasion and

sometimes lifting up to ten pounds. (ARIDI 2829).

      After Unum notified Ms. Kamerer that her benefits would be discontinued, Dr. Lemons,

one of her treating physicians, wrote a letter to Unum dated September 25, 2013, noting that Ms.

Kamerer "continues to experience severe chronic pain that makes it impossible for her to be

involved in gainful, meaningful employment. (ARIDI at 2559).   On September 18, 2013, Unum

sent another one of Ms. Kamerer's treating physicians, Dr. Samuel Lehman, a questionnaire.   On

the questionnaire he certified that Ms. Kamerer's current diagnoses included fibromyalgia,

migraines and depression; that she did not have the functional capacity to work full-time while

performing activities that require the ability to sit frequently, stand or walk on occasion, lift up to

10 pounds occasionally and travel on occasion; that "she cannot sit for any length of time that

would make working possible.   The patient cannot travel regularly which is a requirement of her

job." (ARIDI at 2566-2567).   Dr. Lehman further reported that "although the patient can sit occasionally, once the patient begins sitting she is able to sit for shorter and shorter periods of time, so over time she is unable to sit at all for several days." (ARIDI at 2569).   Finally, when asked about the possibility of improvement or a change in Ms. Kamerer's condition, Dr. Lehman replied, "Unless new treatments for fibromyalgia are found the patient is not expected to have any significant improvement." (ARIDI at 2568-2569).   On October 25, 2013, Dr. Lemons documented in his medical records that Ms. Kamerer's pain was "really bad. More frequent flare ups." (ARIDI at 3297).   On November 11, 2013, Dr. Lemons noted that Ms. Kamerer's "pain levels are higher most of the time.   Depression also 'really bad' as she has to move out of her home." (ARIDI at 3297).   Subsequently, Unum's in-house medical consultant, Dr. LaClaire recommended an independent medical examination to determine Ms. Kamerer's functional capacity. (ARIDI at 2925).   On December 10, Unum notified Ms. Kamerer that it wanted her to participate in an in-person evaluation and that Unum would continue to make payments in the interim under reservation of rights. (ARIDI at 2956-2958; ARLTD at 3651-3653).

On December 16, 2013, Unum claims examiner Andy Hamilton wrote to Ms. Kamerer's counsel, explaining that Unum had arranged for a medical examination with Dr. Steven Hendler, a physical medicine and rehabilitation physician. (ARIDI 2983-2984).   A letter from Unum to Dr. Hendler informed him that Kamerer was a System Project Manager and asked him to assess whether Kamerer had the functional capacity for full time work with sedentary physical demands. (ARIDI 2987-2988).   Dr. Hendler's exam took place on January 13, 2014 and is a point of contention between the parties.   The Plaintiff asserts that the exam lasted approximately five minutes. (ARIDI at 3047-3050; ARLTD 4873-4874).   Dr. Hendler contends that the appointment was longer because his calendar slotted the appointment in an hour block. Hendler Dep. 61: 24-

25. Dr. Hendler concluded that Ms. Kamerer was suffering from fibromyalgia, depression, headaches, pain associated with psychological factors and a general medical condition, and hypothyroidism. (ARLTD at 4825).  In his opinion, Ms. Kamerer historically met the criteria for fibromyalgia and likely met the current criteria. (ARLTD at 4825).  With respect to functional capacity, Dr. Hendler was asked and answered:

    a.  In your expert opinion, if her psychological symptoms and conditions are not taken into account due to policy limitations, would Ms. Kamerer have functional capacity for a full time occupation with Sedentary physical demand as defined by the Department of Labor that is performed with:
        a.  Frequent Sitting, Talk, Hear, Hear Acuity, Keyboard Use
        b.  Occasional walk, Sit/Stand Option, Reach, Finger, Feel, Handle, Lift/Carry and Push/Pull up to 10 pounds, travel.

Yes. It is noted that this patient has no objective findings of abnormality on examination. She reports tenderness to palpation at multiple locations.  Neurosurgery and musculoskeletal examinations are both otherwise essentially normal.  Review of the records shows longstanding symptoms set in excess of objective findings in combination with significant psychological/psychiatric issues.  While these psychological/psychiatric issues influence Ms. Kamerer's self-perceived physical condition and capabilities, from a purely physical standpoint, in absence of these psychological symptoms and conditions, there is no identified basis to conclude Ms. Kamerer is unable to perform the required activities at the Sedentary physical demand level as outline above. (ARLTD at 4825-4826).

Shortly after Dr. Hendler's examination, Dr. Lemons noted in his medical records that Kamerer's "pain level varies from 4 to 9. Has had more frequent 'bad pain'.  Saw IME and waiting for report.  Depression has been higher." (ARIDI 3298).  On February 18, 2014, Dr. Lemons documented in his records that Kamerer's pain range was 5 to 9. (ARIDI at 3298).

On February 28, 2014, an Unum Quality Control Consultant, James Doyle, wrote: "the occupational demands outlined by [the Vocational Rehabilitation Consultant] are in excess of the functional capacity supported by the IME provider.  It is unclear whether the IME provider would support the increased demands." (ARIDI 3024).  Indeed, by Dr. Hendler's own admission, he seemed to know little of Ms. Kamerer's job or its physical demands.  In his deposition, Dr. Hendler testified that he knew "that she worked as a consultant for a large consulting firm.  That's pretty

much the extent of what I know about the specifics of her job." Hendler Dep. 36: 1-4.  Further, Dr.

Hendler testified that he did not recall seeing Ms. Kamerer's job description and that, if he had, he

would have included it in his report.

In March 2014, Unum Life and Provident Life followed up with Dr. Hendler and posed the

following questions:

> If her psychological symptoms and conditions are not taken into account due to policy
> limitation, would Ms. Kamerer have the functional capacity to perform the following
> demands on a full-time basis:
>
> - Exerting up to 10 pounds of force occasionally, a negligible amount of force frequently
>   to move objects;
> - Sitting most of the time, but may involve walking or standing for brief periods of time;
> - Constant keyboard use, talking and hearing;
> - Frequent near acuity; and
> - Occasionally walking, sit/stand option, handling, accommodation and travel.

Based on his previous exam, Dr. Hendler answered "Yes" to this question. (ARLTD at

4857).

On March 4, 2014, Dr. Lemons documented in his records that Ms. Kamerer's pain was an

8, ranged from 6-9, and that they "focused on stress factors that affect her pain level." (ARIDI at

3298). On March 18, 2014, Dr. Lemons documented Ms. Kamerer's pain to be a 7 and on April

23, 2014, documented it to be an 8. (ARIDI at 3298).  In July, 2014, Dr. Lemons wrote a letter to

Unum explaining that Ms. Kamerer suffers from "severe fibromyalgia" in addition to "emotional

responses secondary to her medical condition," which "include severe depression and frequent

episodes of very high levels of anxiousness." (ARIDI at 3271).  He went on to attest that "her

medical condition of fibromyalgia is the major factor; the secondary effects of depression and

anxiety also occur at a frequency that prevents her from being employed." (ARIDI at 3271).

In September 2014, the claim was referred back to Dr. LaClair. (ARIDI 3332-3333).  In

his review, Dr. LaClair referenced 17 visits Ms. Kamerer made to Dr. Lemons in 2013 and 2014,

all of which documented severe and chronic pain. (ARIDI at 3332). Based on Dr. Hendler's examination from January, however, Dr. LaClair concluded that Ms. Kamerer was not occupationally disabled. (ARIDI at 3333). In Dr. LaClair's opinion, Ms. Kamerer's pain was secondary to psychological symptoms. (ARIDI at 3333). In his words, "the stability of Dr. Lehman's treatment and his documentation that she is withdrawing from medications (Lamictal, Limbitrol) and using minimal pain medication (Suboxone) are consistent with Dr. Hendler's assessment. This is not consistent with the moderate to severe . . . level of pain that fluctuates with her psychological evaluations (every 2-4 weeks recently). (ARIDI at 3333).

Therefore, regarding Ms. Kamerer's claim with respect to fibromyalgia, it was determined that as of September 2014, she was able to perform the material and substantial duties of her occupation. (ARIDI at 3347-3352; ARLTD at 5221-5228). In a September 19, 2014 denial letter regarding her Group LTD policy, Unum explained that it had determined that Ms. Kamerer's loss of functional capacity resulted from mental illness beginning with her first psychological evaluation in 2004, and that her medical records supported a loss of functional capacity until at least April of 2007. (ARLTD at 5221-5228). On September 29, 2014, Unum sent a letter regarding Ms. Kamerer's IDI policy and maintained that she was not occupationally disabled due to physical impairments and that Unum would continue to investigate whether she was disabled from a mental disorder—if she was, she would have already been paid for 13 of the 24 months under the policy's maximum benefit period for mental disorders. (ARIDI at 3347-3352).

### 3.  *The Appeal Process*

On March 18, 2015, Ms. Kamerer exercised her right of administrative appeal. (ARLTD at 5261-5319). Included with her appeal, Ms. Kamerer attached a sworn statement from Dr. Lemons, attesting to her continued disability from a physical perspective; information regarding

10

Unum's history of biased claims management; and newspaper articles documenting Unum's increasing profits. (ARLTD at 5261-5319). Thereafter, a further review of Ms. Kamerer's medical history was conducted by internal physician Dr. Beth Schnars. (ARLTD at 5394-5401). Dr. Schnars noted that Ms. Kamerer's occupation was sedentary but did not analyze the material duties of her occupation as defined by the vocational review. (ARLTD at 5394-5401). Dr. Schnars concluded, "there is no physiologic evidence to support ongoing impairment which would preclude sustained functionality of at least full time sedentary level defined as 'Exerting up to 10 pounds of force occasionally and/or a negligible amount of force required to lift, carry, push, pull or otherwise move objects, including the human body.'" (ARLTD at 5398). Dr. Schnars further found:

> Ms. Kamerer has a long history of chronic diffuse pain attributed to fibromyalgia. There is no indication of other underlying axial or peripheral joint pathology with early OVN [office visit notes] demonstrating very modest degenerative changes of the spine normal peripheral joint surgery. Serial connective tissue and inflammatory panels have been unremarkable. There have essentially been no documented musculoskeletal exams in later OVN with serial normal neurologic exams. The medical records do not describe abnormalities of physical exam or deficits of functional capacity sufficient to support the restrictions and limitations described. Fibromyalgia is not a disease of muscle or joint pathology, does not cause weakness and is not a progressive process. Predominant treatment modalities include daily aerobic activity and cognitive behavioral therapy and certain classes of medication such as tricyclic antidepressants and some neuropathic pain medications. Rest and opioid type medications are not noted to be effective treatment strategies. Ms. Kamerer was not involved in aerobic exercise program nor is exercise associated with any physiologic detriment. Reports of pain have been positively correlated with underlying psychological/emotional stressors. Ms. Kamerer was initiated on escalating doses of narcotics earlier in the OVN. She has since 2011 been maintained only on Suboxone with initial intent to wean. While this medication is not recommended treatment for fibromyalgia and wean off the medication has not been pursued, she has not required escalating doses of narcotic medications and there is no documented adverse side effects. The medical records do not support additional R&L's which would preclude full time work activity at the sedentary level. (ARLTD at 5399).

Unum Life and Provident Life subsequently upheld the decision that Ms. Kamerer was not occupationally disabled due to fibromyalgia or any other medical condition. (ARLTD at 5431-5439).

### Discussion

### *1. Standard of Review*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In the ERISA context, however, the review utilized by a district court on a motion for summary judgment differs from the review typically utilized since "summary judgment is simply a vehicle for deciding the issue.  This means the non-moving party is not entitled to the usual inferences in its favor."  *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005) (citation omitted).  Thus, "[i]n reaching its decision on the record, a district court on de novo review 'may weigh the facts, resolve conflicts in the evidence, and draw reasonable inferences.'" *Doe v. Harvard Pilgrim Health Care, Inc.*, No. 17-2078, 2018 WL 4237288, at *6 (1st Cir. Sept. 6, 2018) (quoting *Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.*, 852 F.3d 105, 111 (1st Cir. 2017)).

Where, as here, the plan does not unambiguously provide the administrator with discretionary authority to determine benefit eligibility, the court's review of the administrator's determination is *de novo*.  *Orndorf*, 404 F.3d at 517.  Under *de novo* review, the court's "task is to independently weigh the facts and opinions in the administrative record to determine whether the claimant has met his burden of showing that he is disabled within the meaning of the policy." *Richards v. Hewlett-Packard Corp.*, 592 F.3d 232, 239 (1st Cir. 2010).

### 2.   *Burden of Proof*

Before Ms. Kamerer may prevail on a claim of wrongful termination of benefits, she has the burden of demonstrating that she is disabled within the terms of the applicable plan. *See Orndorf*, 404 F.3d at 519.  Therefore, Ms. Kamerer must show by a preponderance of the evidence that she cannot perform the duties of her occupation as defined within the national economy.  In other words, the Plaintiff must demonstrate that she cannot meet one of the necessary conditions of her employment.  She will thus satisfy her burden if she can demonstrate either:

(1) She cannot exert up to 10 pounds of force occasionally and a negligible amount of force frequently to move objects; *or*

(2) That she cannot work while sitting most of the time, although the job might include walking or standing for brief periods; *or*

(3) That she cannot work in an occupation that mandates travel, the frequency of which would be job specific.

### 3.   *Type of Proof Required*

As a preliminary matter, the First Circuit has held that it is unreasonable to require objective evidence supporting a diagnosis such as fibromyalgia that inherently evades objective verification. *See Cook v. Liberty Life Assurance Co.*, 320 F.3d 11, 21 (1st Cir. 2003).  There seems to be no debate that Ms. Kamerer suffers from fibromyalgia.  The Defendant concedes that Ms. Kamerer historically met the criteria for fibromyalgia and likely meets the current criteria. (ARLTD at 4825).  It is proper to analyze, however, whether the evidence supports an inability to work due to "the physical limitations imposed by the symptoms of such illness." *Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 16 n. 5 (1st Cir. 2003).  Thus, the issue is whether Ms. Kamerer's condition has rendered her physically unable to perform the duties of her occupation.

The Defendant argues that Ms. Kamerer's claim must fail because she has produced no *objective* evidence that the symptoms of her condition render her unable to satisfy the physical demands of her profession as defined in the national economy.  They rely on three cases to support this proposition.

In the first case, *Boardman v. Prudential Ins. Co. of America*, the Plaintiff had varying diagnoses and suffered from fatigue, musculoskeletal pain and parotitis. 337 F.3d 9, 12 (1st Cir. 2003).  She was also employed in a profession with demands much like those of Ms. Kamerer. *Id.* Similar to this case, Prudential required Boardman to undergo an independent medical examination.  Unlike Ms. Kamerer's case, no definite diagnosis was established but, even if one were established, the IME concluded that the condition was not one that would render Boardman physically disabled from her occupation. *Id.* at 14.  Prudential relied on the fact that "[n]one of the specialists that have treated Ms. Boardman in the past two years have indicated any limitations or restrictions, based on objective findings, that would preclude Ms. Boardman from performing any occupation for which she is suited." *Id.* at 16-17.  In *Boardman*, however, the plan gave the insurer discretionary authority to evaluate claims. *Id.* at 15.  When a plan gives the insurer discretion, district courts review that decision for abuse of discretion—that is, whether the decision to deny benefits is "arbitrary and capricious." *See Doe v. Standard Insurance Company*, 852 F.3d 118, 123 (1st Cir. 2017).  The court held therefore, that it was not arbitrary and capricious for an insurer to require objective evidence when making benefits decisions.

Second, in *Cusson v. Liberty Life Assurance Company of Boston*, the plaintiff also claimed to suffer from fibromyalgia and, also like Ms. Kamerer, had a sedentary job. 592 F.3d 215, 218 (1st Cir. 2010).  Two physicians conducted a review of Cusson's condition on behalf of Liberty and found that there was no "identifiable or medically supported level of functional impairment

that can be objectively verified." *Id.* at 222.  Again, however, because the plan in that case gave Liberty the discretion to determine eligibility for benefits, the court applied an abuse of discretion standard to evaluate Liberty's decision. *Id.* at 223.

Finally, in *Denmark v. Liberty Life Assur. Co. of Boston*, a claimant diagnosed with fibromyalgia was similarly denied benefits based on the opinions of three non-examining medical personnel. 481 F.3d 16 (1st Cir. 2007), *vacated on other grounds*, 566 F.3d 1 (1st Cir. 2009).  The court drew "a distinction between requiring objective evidence of the diagnosis, which is impermissible for a condition such as fibromyalgia that does not lend itself to objective verification, and requiring objective evidence that the plaintiff is unable to work, which is allowed." *Id.* at 37.  Again, however, because the plan in that case gave Liberty the discretion to determine eligibility for benefits, the court applied an abuse of discretion standard to evaluate the decision to deny benefits. *Id.* at 29.

Therefore, all three cases stand for the proposition that, when a plan gives an insurer discretion whether or not to award benefits, it is not arbitrary and capricious for the insurer to require objective evidence.  This does not mean, however, that a district court reviewing a decision to deny benefits *de novo must* require objective evidence.

The decision here, as explained above, is reviewed *de novo*.  Consequently, even if Ms. Kamerer does not provide *objective* evidence that her symptoms preclude her from fulfilling the physical requirements of her occupation, she may still satisfy her burden of proof if the totality of the evidence demonstrates that she is unable to fulfill them.  *See Gross v. Sun Life Assur. Co. of Canada*, 734 F.3d 1, 22 (1st Cir. 2013) ("Although many of [Plaintiff's] physical complaints may not be readily susceptible to objective confirmation, findings of chronic pain may not be automatically dismissed . . . for lack of confirmable symptoms").

4. *Physical Disability*

a. *Occupation as Performed in the National Economy*

Plaintiff first argues that Unum must consider her specific duties as an Associate Partner at Accenture.  Defendants contend that, as both plans dictate, Ms. Kamerer's job is properly measured against the occupation as it is performed in the national economy.

Plaintiff cites *Doe v. Standard Insurance Company*, 852 F.3d 118 (1st Cir 2017) and *McDonough v. Aetna Life Ins. Co.*, 783 F.3d 374 (1st Cir. 2015) for the proposition that when a fiduciary terminates disability benefits under an own-occupation plan, it is required to consider whether the claimant is capable of performing the specific duties of his/her own occupation.  The Plaintiff, however, misreads both cases.  In *Doe*, Standard Insurance's plan, by its own terms, provided that the occupation of lawyers with at least five years of experience would be the subject matter of the type of legal practice in which they specialized. 852 F.3d at 120.  Standard, however, classified the plaintiff's occupation as a "lawyer" despite the fact that the Plaintiff had practiced environmental law for more than five years. *Id.* at 121.  Neither of Ms. Kamerer's policies provide that her occupation would be measured by her specific duties.  In fact, her plans provide just the opposite—that they would be measured as performed in the national economy.

The Plaintiff also finds no support from *McDonough*.  In that case, Aetna Life Insurance did not determine the material duties of the plaintiff's own occupation as it was normally performed in the national economy.  The court noted, the occupation as performed in the national economy "is not mentioned by Aetna in its brief, and neither the denial letter itself nor the reviewers' reports ever discussed it.  In any event, the record is utterly devoid of any explanation of Aetna employee's rational for selecting that particular position from the DOT's compendium of available job classifications." 783 F.3d at 380.  The court went on:

> [U]nder an own occupation standard, medical evidence is only part of the equation. To assess a claimant's ability to perform his own occupation, a decisionmaker must be aware of, and apply, the requirements of the occupation. Here, those requirements are measured by how the occupation is normally performed in the national economy—but the claims administrator and the various reviewers seem to have ignored that fact. *Id.* at 381.

Thus, the problem in *McDonough*, was not that Aetna did not consider the specific duties of the Plaintiff's profession, rather it was their failure to properly consider the duties of her profession within the national economy when deciding to terminate benefits.

*b.  Analysis*

I must decide whether Ms. Kamerer has met her burden of demonstrating by a preponderance of the evidence that she is physically disabled from performing the material duties of her occupation as defined in the national economy.

The Supreme Court noted in *Black & Decker Disability Plan v. Nord*, "Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, *including the opinions of a treating physician*." 538 U.S. 822, 823 (2003) (emphasis added). *See also Kalish v. Liberty Mut./Liberty Life Assurance Co.*, 419 F.3d 501, 510 (6th Cir. 2005) (holding that a plan acted arbitrarily in denying disability benefits when its medical consultant failed to rebut the contrary medical conclusions of the claimant's primary physician); *Love v. national City Cor. Welfare Benefits Plan*, 574 F.3d 392, 397 (7th Cir. 2009) (holding that a plan acted arbitrarily when an insurer "did not explain why it chose to discount the near-unanimous opinions of [Plaintiff's] treating physicians").

Importantly "the opinion of the claimant's treating physician . . . is not entitled to special deference." *Orndorf*, 404 F.3d at 526 (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003)). The First Circuit has noted, however, that "where the claimants credibility is a central factor in the disability determination . . . the impressions of examining doctors sensibly

may be given more weight than those who looked only at paper records." *Gross v. Sun Life Assurance Company of Canada*, 880 F.3d 1, 14 (1st Cir. 2018).

Ms. Kamerer has seen many physicians who have diagnosed her with fibromyalgia and agreed that she is incapable of satisfying the physical demands of a Systems Project Manager.  Dr. Lehman, for example, certified on a questionnaire from Unum that Ms. Kamerer's current diagnoses included fibromyalgia, migraines and depression; that she did not have the functional capacity to work full-time while performing activities that require the ability to sit frequently, stand or walk on occasion, lift up to 10 pounds occasionally and travel on occasion; and that "she cannot sit for any length of time that would make working possible." (ARIDI at 2566).  In fact, Dr. Lehman further reported that "although the patient can sit occasionally, once the patient begins sitting she is able to sit for shorter and shorter periods of time, so over time she is unable to sit at all for several days." (ARIDI at 2569).  He also noted that Ms. Kamerer "cannot travel regularly which is a requirement of her job." (ARIDI at 2566).

In addition, while subjective reports of pain are difficult to prove, they should be accorded some weight on the ledger. *See Gross v. Sun Life Assur. Co. of Canada*, 763 F.3d 73, 84 (1st Cir. 2014) ("Although a benefits administrator is entitled to probe subjective complaints of disabling pain, it must maintain an open mind when evaluating such reports").  Ms. Kamerer's subjective complaints are buttressed by the fact that, for years, she attempted to alleviate her pain by taking numerous strong prescription medications. (ARIDI 3099).  As the Seventh Circuit noted in *Carradine v. Barnhart*,

> What is significant is the improbability that [the claimant] would have undergone the pain-treatment procedures that she did, which included . . . heavy doses of strong drugs . . . , merely in order to strengthen the credibility of her complaints of pain and so increase her chances of obtaining disability benefits; likewise the improbability that she is a good enough actress to fool a host of doctors . . . into thinking she suffers extreme pain; and the (perhaps lesser) improbability that this

host of medical workers would prescribe drugs and other treatment for her if they
thought she were faking her symptoms.  Such an inference would amount to an
accusation that the medical workers who treated [the claimant] were behaving
unprofessionally. 360 F.3d 751, 755 (7th Cir. 2004).

The Defendants contend that, while Ms. Kamerer suffers from fibromyalgia, there are no

objective findings of abnormality to suggest that she is occupationally disabled. (ARLTD at 4825-

4826).  To support that conclusion, they rely on the independent examination conducted by Dr.

Hendler and the medical records submitted by Ms. Kamerer.  First, there is considerable debate

regarding the diligence of Dr. Hendler's exam.  In a sworn affidavit, Ms. Kamerer alleges it was

only five minutes and that Dr. Hendler never asked her what she physically could and could not

do. (ARIDI at 3047-3050; ARLTD 4873-4874).  When deposed regarding the examination, Dr.

Hendler said that his calendar indicated that the appointment was scheduled for an hour and that

"We run on time approximately 95 percent of days, times are approximate." Hendler Dep. 62: 3-

19.  Running on time, however, only requires not running over the allotted time, it says nothing

about how the doctor fills it.

Even assuming that the examination was thorough, Dr. Hendler concluded that Ms.

Kamerer was not disabled, from a purely physical perspective, from engaging in an occupation

characterized, among other things, by "frequent sitting."  Unum, realizing that frequent sitting is

not synonymous with spending the majority of one's time in a chair, followed up with Dr. Hendler

to inquire whether or not Ms. Kamerer could fulfill the physical requirements of a Systems Project

Manager.  He wrote "Yes" on the letter and sent it back. (ARLTD at 4857).

The Defendants note that Dr. Hendler provided a detailed summary of Ms. Kamerer's

medical history.  The conclusion that Dr. Hendler reached after reviewing the summary, however,

is dubious.  The summary noted:

- Ms. Kamerer was seen on February 2, 2004 with severe musculoskeletal pain, unable to drive and not functional.  She was prescribed OxyContin and Lortab. (ARLTD at 5153).

- She was seen on February 13, 2004 with pain in the knees, hips, back, hands, and elbows. Her pain was severe even with OxyContin and Lortab and worsening.  The treating doctor's impression was "evolving fibromyalgia" among other conditions. (ARLTD at 5153).

- On February 16, 2004 the patient had worsening "fibromyalgia-type symptoms" and was "wheelchair-bound."  Doctors considered steroids. (ARLTD at 5153).

- On February 17, 2004, Dr. Steven M. Simon saw Ms. Kamerer with "ongoing severe pain noted."  It was reported that Ms. Kamerer had "significant relief of pain from the Actiq" but still had "a significant amount of difficulty getting up and down off the exam table." (ARLTD at 5156).

- On March 6, 2004, Dr. Katz found twelve of 18 classic fibromyalgia trigger points tested positive.  He also noted that Ms. Kamerer had "been tried on Lortab, OxyContin, Actiq, and Gabitril without significant pain control.  Patient had essentially been using a wheelchair because of the level of pain rendering her non-ambulatory." (ARLTD at 5155).

- On March 18, 2004, the patient was seen with "severe fibromyalgia."  On March 23, 2004, ten of 18 tender points that identify fibromyalgia were positive.  (ARLTD at 5154).

- On April 5, 2004, Ms. Kamerer was "determined to be disabled due to her fibromyalgia." (ARLTD at 5154).

- On April 24, 2004, Dr. Ann Kearns recommended fibromyalgia treatment after a positive finding of "15 of 18 standard tender points." (ARLTD at 5156).

- In April 2004, Ms. Kamerer was seen at the Mayo Clinic and diagnosed with "fibromyalgia, depression, hypothyroidism, anemia, hypercalcemia, possible sleep apnea, and angioma." (ARLTD at 5156).

- Ms. Kamerer was seen on "a monthly basis throughout 2005." She was taking Actiq and using a fentanyl patch. She also began taking Lyrica in May 2006 and Opana in October 2006. (ARLTD at 5158).

- On January 11, 2005, Ms. Kamerer seemed to be improving and Dr. Navato indicated that she could perform 10 hours sedentary activity daily. (ARLTD at 5158).

- On January 26, 2005, Ms. Kamerer was seen by Dr. Michael Schwartzman. She was taking Neurontin, Zonegran, Prozac, Wellbutrin, Synthroid, Aciphex, Zelnorm, Vistaril, trazodone, and Fioricet. Dr. Schwartzman found "multiple tender points consistent with fibromyalgia, with modest possible tremor in both arms persisting with kinetic movements." (ARLTD at 5159).

- On April 5, 2005, Dr. Nick Navato indicated that Ms. Kamerer "could perform three to four hours of sedentary to light activity per day with marked limitations of activity." (ARLTD at 5157). He further indicated that Actiq worked well for Ms. Kamerer. She was also taking Phenergan, Maxalt, Zonegran, trazodone, and Synthroid at the time. (ARLTD at 5158).

- On April 18, 2005, however, she was seen again with increased pain. (ARLTD at 5158).

- On June 16, 2005, Dr. Susan Sweat saw Ms. Kamerer and "felt that she had urgency with fibromyalgia." (ARLTD at 5163).

- Ms. Kamerer was also seen monthly in 2007. "Dr. Navato indicated that the patient could lift 1-10 pounds occasionally, never more than 10 pounds . . . This was based on the

patient's report and clinical experience.  She could perform two hours a day of sedentary
duty." (ARLTD at 5158).

- In November 2009, Dr. Navato noted the patient could return to work for 10 hours per
  week.  She continued taking Duragesic, Actiq, and Vistaril. (ARLTD at 5158).

- In 2011, Dr. Navato prescribed Suboxone. (ARLTD at 5158).

- On March 19, 2013, Ms. Kamerer was seen at Pierce Medical Clinic and her Suboxone
  was continued. (ARLTD at 5155).

- On July 17, 2013, Dr. Lehman evaluated Ms. Kamerer.  He found her gait antalgic and
  believed she had fibromyalgia. (ARLTD at 5163).

- On August 21, 2013, Dr. Lehman started Ms. Kamerer on Viibryd, and increased her
  Lamictal dosage. (ARLTD at 5164).

- On September 25, 2013, Dr. Lemons noted that "the patient suffered from severe chronic
  pain which was disabling her."  In his opinion, "she suffered from severe chronic pain that
  made it impossible for her to be involved in gainful, meaningful employment." (ARLTD
  at 5159).

- On September 18, 2013, Dr. Lehman noted that Ms. Kamerer's pain made it impossible for
  her to do any lifting other than occasionally up to 10 pounds, no stooping or crawling, and
  occasional standing, walking, and sitting. (ARLTD at 5164).

After summarizing the findings, Dr. Hendler concluded that, from a purely physical standpoint,
Ms. Kamerer could satisfy the physical demands of a Systems Project Manager. (ARLTD at 4857).

Drs. LaClair and Schnars, Unum's internal medical consultants, conducted a paper review
of Ms. Kamerer's medical records after she filed her administrative appeal. (ARLTD at 5207-
5209; 5396-5401).  The First Circuit, however, has held that these reviews may be given less

weight when credibility is central to a plaintiff's disability claim. *See Gross*, 880 F.3d at 14.  Dr. Schnars concluded that Ms. Kamerer was not occupationally disabled from sedentary work but did not analyze the material duties of her occupation as defined by the vocational review. (ARLTD at 5394-5401).  Dr. LaClair concluded that Ms. Kamerer had the functional capacity to perform the duties of a Systems Project Manager. (ARIDI at 3333).

None of Unum's reviewers offered any reasons to disagree with the numerous other medical professionals that had seen Ms. Kamerer over a period of many years and without any explanation "arbitrarily refuse[d] to credit" their findings. *Nord*, 538 U.S. at 823.  They simply reiterated that there was objective evidence that Ms. Kamerer was physically disabled.  First, I disagree that there is no objective evidence.  Numerous doctors found that Ms. Kamerer positively tested for many fibromyalgia tender points.  In addition, Ms. Kamerer may satisfy her burden by relying on all of the other evidence in the records.

In *Gross*, the First Circuit was presented with a case much like this one.  The plaintiff suffered from fibromyalgia and was denied benefits due to insufficient objective evidence substantiating her disability despite a number of doctors confirming her diagnoses. 734 F.3d at 4. Like Ms. Kamerer, "doctors uniformly perceive[d the plaintiff's] complaints of pain and limited capacity to be credible." *Id.* at 23.  Further, "even with negative tests and some puzzlement over the extent of her reported pain, doctors continued to diagnose her with RSD and fibromyalgia." *Id.* at 24.  Ultimately, the First Circuit found that "the sustained and progressive nature of [the plaintiff's] complaints, their facial credibility to the medical practitioners who personally examined her, and the objective symptoms consistent with RSD—given the absence of any method for reaching a conclusive diagnosis—support a finding of total disability." *Id.* at 24-25.

Ms. Kamerer has been diagnosed with fibromyalgia by countless medical professionals. These doctors have also stated in clear terms that she cannot fulfill the physical demands of her profession as performed in the national economy.  Doctors have observed objective evidence, found her subjective complaints to be credible, and consequently concluded that she is occupationally disabled.  She has also taken copious amounts of strong prescription medications and endured their accompanying and significant side-effects.

There is certainly not an overabundance of "objective" evidence that Ms. Kamerer is disabled.  Nonetheless, there is some objective evidence and, when that evidence coupled with the overwhelming amount subjective evidence credited by medical professionals, it is clear that Ms. Kamerer has satisfied her burden of demonstrating that she is disabled from fulfilling the duties of her profession as it is performed in the national economy by a preponderance of the evidence. Specifically, I find that Ms. Kamerer is disabled from an occupation, like a Systems Project Manager, that requires her to be seated most of the time.

### 5. *Mental Health Limitation*

#### a. *Burden of Proof*

The Defendants argue that, if Ms. Kamerer is disabled, it is due to mental illness. According to Ms. Kamerer's policies, a disability "due to Mental Illness" or "caused by a Mental Disorder" has a limited pay period of 24 months.  The parties disagree about the standard of proof at this stage of the litigation.  Defendants content that because Ms. Kamerer has the burden of proof regarding her benefits, she must demonstrate that the limitation does not apply.  The Plaintiff argues that to prove the applicability of an exclusion, the Defendant has the burden of proof.  The

mental illness limitation, however, is not an exclusion.   Indeed, there are exclusions under a different section of the plan.

"The issue of whether it is the insured or the insurer who bears the burden of proving that a limitation does or does not apply remains unsettled." *Seaman v. Mem'l Sloan Kettering Cancer Ctr.*, 2010 WL 785298, at \*10 (S.D.N.Y. 2010).   Some courts have held that the claimant bears the burden of showing the limitation does not apply.   In *Hoffmann v. Life Insurance Company of North America*, for example, the court held that a mental illness limitation was not an exclusion under the policy, and therefore, the plaintiff bore the burden of proving the limitation did not apply. 2014 WL 7525482, at \*5-6 (C.D. Cal. 2014).   *See also Doe v. Prudential Ins. Co. of Am.*, 2016 WL 8609983, at \*5 (C.D. Cal. 2016); *Ringwald v. Prudential Ins. Co. of Am.*, 754 F. Supp. 2d 1047, 1056-57 (E.D. Mo. 2010). On the other hand, some courts have found that the insurer bears the burden of proof.   For instance, in *Okuno v. Reliance Standard Life Ins. Co.*, the Sixth Circuit held that the insurer "bears the burden to show that the exclusion on which it based denial of benefits, the Mental and Nervous Disorder Limitation, applies in this case." 836 F.3d 600, 609 (6th Cir. 2016).   *See also Owens v. Rollins, Inc.*, 2010 WL 3843765 (E.D. Tenn. 2010); *Deal v. Prudential Ins. Co.*, 263 F. Supp. 2d 1138, 1143 (N.D. Ill. 2003).

I find that the better approach is to shift the burden to the Defendants.   Ms. Kamerer has demonstrated that she is physically incapable of performing the duties of her profession as defined within the national economy.   As such, she is entitled to disability benefits within the meaning of her plans.   If Unum wants to then reduce her benefits, it seems appropriate that they should demonstrate why Ms. Kamerer is not entitled to those benefits.   Moreover, that the burden rests with Unum seems especially fitting given the facts of this case.   For almost 10 years, Unum paid Ms. Kamerer benefits uninterrupted.   In September 2013, Unum contended that Ms. Kamerer was

not physically disabled within the meaning of her plans.  When her treating physicians began to contest that conclusion, Unum reinstated benefits under a reservation of rights.  Shortly thereafter, and for the first time, Unum seemingly changed course and alleged that Ms. Kamerer's disability was due to psychological conditions.  Given these circumstances, it is fitting that Unum bear the burden of demonstrating the limitation applies.  *See Jarillo v. Reliance Standard Life Ins. Co.*, 2017 WL 1400006, at *10 (S.D. Cal. Apr. 19, 2017) (holding that the insurer bears the burden of proof when insurer "did not rely upon the mental disorder limitation until the final denial of benefits" after nearly five years of paying physical disability benefits).

b. *Analysis*

Thus, Unum must demonstrate by a preponderance of the evidence that Ms. Kamerer's condition is "due to" or "caused by" mental illness.  The Fifth Circuit, surveying other Circuit Courts that considered the meaning of the phrase "caused by or contributed to by" mental illness in the context of ERISA limitation policies, concluded that "[e]ach of those courts has interpreted the 'caused by or contributed to by' language to exclude coverage only when the claimant's physical disability was insufficient to render him totally disabled.  In other words, those courts have asked whether the mental disability is a but-for cause of the total disability. *George v. Reliance Standard Life Ins. Co.*, 776 F.3d 349, 355-356 (5th Cir. 2015).  *See also Okuno*, 836 F.3d at 609 ("We follow the analyses of our sister circuits and apply the but-for inquiry to the Mental and Nervous Disorders Limitation as did the Fifth Circuit . . . as well as the Ninth and Third Circuits").  Therefore, Unum must show that Ms. Kamerer's mental conditions are a but-for cause of her inability to fulfill the physical demands of her occupation.

The Defendant has not demonstrated by a preponderance of the evidence that Ms. Kamerer's depression is a but-for cause of her physical disability.  Dr. Lemons, a pain management

specialist that had been treating Ms. Kamerer for years, concluded that fibromyalgia is the primary cause of her inability to work. (ARIDI at 3271).  Dr. Lehman similarly concluded that "Unless new treatments for fibromyalgia are found the patient is not expected to have any significant improvement." (ARIDI 2568-2569).   This diagnosis did not consider the possibility of improvement by treating Ms. Kamerer's underlying depression and therefore implies it is not a but-for cause of her symptoms.  Moreover, Unum's own consultants, Dr. Malcolm Spica and Dr. Stuart Shipko, conducted file reviews and concluded that Ms. Kamerer was *not* disabled from psychiatric symptoms. (ARIDI 3409; 3413).

Unum points to the conclusions of Dr. Katz, Ms. Kamerer's arthritis specialist.  In 2004, he noted that Ms. Kamerer had fibromyalgia and that depression could be playing a role in her condition. (ARLTD at 255).  A month later, Dr. Katz noted that Ms. Kamerer's condition was "a classic fibromyalgia picture" but "[a]s is typical with pain syndromes, it has been difficult to establish whether her depression has been primary or secondary." (ARLTD at 167).  Of course, Ms. Kamerer's psychological struggles may be playing a role in her physical well-being.  That her depression is influencing her fibromyalgia, however, does not rise to the level of but-for causation.

The only doctors to conclude that Ms. Kamerer's psychological symptoms are a but-for cause of her physical disability are Dr. Hendler and Dr. LaClair.  Dr. Hendler's aforementioned exam concluded that if her psychological symptoms and conditions are not taken into account, Ms. Kamerer would have the functional capacity for a full-time occupation with Sedentary physical demands. (ARLTD at 4825-4826).  As discussed above, however, the disputed diligence of Dr. Hendler's exam at least cast some doubt on his findings.  Dr. LaClair simply reiterated Dr. Hendler's findings with respect to Ms. Kamerer's psychological symptoms.  In his words, "Dr. Hendler performed a detailed examination and found that if her psychological symptoms and

conditions including depression and anxiety are not taken into account there is no identified basis to conclude she is unable to perform the physical demands outlined above." (ARLTD 5208-5209). Thus, it is unclear whether this part of Dr. LaClair's findings deserve much independent weight on the leger.

Finally, an Unum internal consultant, Paul Burgos concluded that "it was clinically reasonable to assert that psychiatric symptoms caused or contributed to her overall decrease in functional capacity from at least April 2004 to May 2007 and it was likely that her symptoms had persisted since that time." (ARLTD at 4665-4668).   It is undoubtedly reasonable that Ms. Kamerer's mental health has affected her physical symptoms, however, proving but-for causation by a preponderance of the evidence is a higher bar than reasonableness.

Ultimately, when considering the totality of the evidence, I cannot conclude that Ms. Kamerer's depression is a but-for cause of her physical disability.   Thus, Defendants have not satisfied their burden of proof and, consequently, Ms. Kamerer's disability does not come within the ambit of the policy limitation.

### Conclusion

Plaintiff's motion for summary judgment (Docket No. 97) is ***granted*** and Defendants' motion for summary judgment (Docket No. 94) is ***denied***.  Plaintiff's long-term disability benefits are hereby reinstated and she is to be compensated for past benefits due.


**SO ORDERED**


*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**